## UNITED STATES *v.* LANE.

1. The 8th section of the act of July 2d, 1864, which enacts that it shall be lawful for the Secretary of the Treasury, with the approval of the President, to authorize agents to purchase for the United States any products of States declared in insurrection, did not confer the power to license trading within the military lines of the enemy.

2. In connection with the regulations of the Treasury Department, and an executive order of the President, issued in accordance with the act, it authorized the insurgents to bring their cotton within our lines, without seizure, and with a promise on our part to buy it from them, with liberty on theirs to go to the nearest treasury agent in an insurrectionary district to sell it, or if they preferred, to leave it under the control of some one who could go to such agent and sell it for them; with leave, to them also, by way of further inducement, to purchase such articles of merchandise as they needed, not contraband of war, to the extent of one-third of the aggregate value of the products sold by them, and to return with them under a safe conduct.

3. By the regulations issued under the act, the purchasing agent could not act at all until the person desiring to sell the Southern products made application, in writing, stating that he owned or controlled them, stating also their kind, quality, and location; and even then the power of the purchasing agent before the delivery of the products was limited to a stipulation (the form was prescribed) to purchase, and to the giving a certificate that such application was made, and to requesting safe conduct for the party and his property.

4. A record of a judgment on the same subject-matter, referred to in a finding, cannot be set up as an estoppel, when neither the record is set forth, nor the finding shows on what ground the court put its decision: whether for want of proof, insufficient allegations, or on the merits of the case.

APPEAL from the Court of Claims, the object of the suit having been to recover damages against the United States for an alleged breach of contract, made by George Lane

with one Risley, who was at the time the treasury agent at Norfolk, Virginia, for the purchase of the products of insurrectionary States.

The case, which depended in part on statutes, regulations of the treasury, and a proclamation of the President, was thus:

### ACTS OF 1861 AND 1863.

By act of July 13th, 1861, section 5, "all commercial intercourse" by and between States declared in insurrection and the citizens thereof, and the citizens of the rest of the United States, was declared unlawful, except such as should be licensed by the President, and conducted under the regulations made by the Treasury Department.

An act of March 12th, 1863, authorized agents of the Treasury Department to collect "all abandoned and captured property," &c., and enacted that "all property coming" into any of the United States not declared in insurrection "from within any of the United States declared in insurrection, through or by any person other than a treasury agent, or under a lawful clearance by the proper treasury officer, shall be confiscated."

### TREASURY REGULATIONS OF MARCH 31ST, 1863.

The treasury regulations issued March 31st, 1863, by their section 7, ordered thus: "No permit shall be granted to transport to or from, or to sell or purchase in any place or section whatever, *not within the military lines* of the United States army."

Regulation 8, as revised and published September 12th, 1863, declared: "Commercial intercourse with localities beyond the lines of military occupation by the United States forces is strictly prohibited, and no permit will be granted for the transportation of any property to any place under the control of insurgents against the United States."

### ACT OF 1864.

By the 4th section of an act of July 2d, 1864, the prohibitions of the act of July 13th, 1861, were extended to "com-

mercial intercourse by and between persons residing or being within the lines of National military occupation, in such districts declared in insurrection, whether *with each other* or with persons being within such insurrectionary districts, but not within our military lines."

Section 8 of this act provided that the Secretary of the Treasury might authorize agents "to purchase *for the United States* any products of States declared in insurrection *at such places* therein as *shall be designated by him,* at *such price* as shall be *agreed on* with the seller, not exceeding the market price thereof at the place of delivery, nor exceeding three-fourths of the market value thereof in the city of New York, at the latest quotations known to the agent purchasing."

. Section 9 of this act *repealed* so much of section 5 of the act of July 13th, 1861, as made it *lawful for the President to license* or *permit* such trade by *private citizens* and *traders* except to supply necessaries to loyal persons *within* the Federal lines, and to authorize persons within the Federal lines to bring or send to market in loyal States products of their own labor or of the labor of freedmen or others in their employment.

### TREASURY REGULATIONS OF JULY 29TH, 1864.

On the 29th of July, 1864, rules were promulgated by the Secretary of the Treasury, and by one of which "commercial intercourse with localities *beyond* the lines of *actual military occupation* by the United States forces *is absolutely prohibited;* and *no permit* will be granted for the transportation of *any property* to *any place* under *the control of insurgents* against the United States."

### TREASURY REGULATIONS OF SEPTEMBER 24TH, 1864.

. On the 24th of September, 1864, general regulations for the purchase, on government account, of products of insurrectionary States, were made by the Secretary of the Treasury, approved by the President, by which Norfolk was made a purchasing point, and the special agent was required (by Regulation 7), to the extent of the funds at his command,

to purchase *all products* offered to him (of the character which by his instructions he was authorized to buy); "but *no liability of any character* shall be *authorized* or *assumed* by any agent, *for* or on account of *the government*, previous to the *actual delivery of the products*, other than a stipulation to purchase products *owned* or *controlled by applicants*, at a *price to be agreed upon at the place and date of delivery.*" The form of this stipulation is given, and consists of a certificate by the treasury agent, that he has "*agreed to purchase*" from C. D. property, &c., "which he stipulates shall be delivered to me, *unless prevented* from so doing *by the authority of the United States*," with a "request" for "safe conduct."

By Rule 8, "whenever any person shall make application to the purchasing agent in writing, setting forth that he '*owns* or *controls*' products, stating the kind, quantity, and location thereof, or the date at which they will be delivered at some specified location accessible to transportation," the purchasing agent was directed to give a certificate that such application had been made, and request safe conduct for such party and his necessary transportation to the location specified, and for himself and products from the location specified to the purchasing agent. (The form of this certificate is given.) Rule 9 provided that parties, having sold and *delivered* products, shall, upon their request, be furnished by the purchasing agent with a certificate stating the character and quantity of articles purchased, the price paid, the aggregate amount of payment, *the place whence*, and *the route by which* the property was transported.

### PRESIDENT'S PROCLAMATION, SEPTEMBER 24TH, 1864.

On September 24th, 1864, the President issued his proclamation, reciting that Congress had authorized the purchase for the United States of products of States declared in insurrection, and that the Secretary of the Treasury had designated Norfolk and other places named therein as places of purchase, and had made regulations for such purchases, and he therefore proclaimed that all persons, except those in the service of the government, "*having in their possession*" such

*products* (and which said agents were authorized to purchase), "and all persons *owning* or *controlling such products*," are authorized to convey them to either of said places of purchase, and "such products, so destined, shall not be liable to detention, seizure, or forfeiture, while *in transitu* or awaiting transportation." And that "any person having the certificate of a purchasing agent, as prescribed by Treasury Regulation 8, is authorized to pass with means of transportation to the points named in said certificate, and to return therefrom with the products required for the fulfilment of its stipulations." And that "any person having *sold, and delivered* to *a purchasing agent products* of an insurrectionary State," "and having in his possession a certificate of the fact, stating the character and quantity of products, and the aggregate amount paid therefor, as prescribed by Regulation 9, shall be permitted" "to purchase from any authorized dealer," at the place of sale, or any other place in a loyal State, any "articles not contraband of war, nor prohibited by the War Department," "to an amount not exceeding in value one-third of the aggregate value" of products sold by him as certified by the agent; and "such articles may be transported by the *same route* and *to the same place, from* and *by which* the *said products* sold and delivered, *reached the purchasing agent*," and *such goods* "shall have safe conduct, and shall not be subject to detention, seizure, or forfeiture, while being transported *to the places and by the route set forth in said certificate.*"

Generals and military officers commanding districts, posts, or detachments, and officers commanding fleets, flotillas, and gunboats, "*will give safe conduct* to persons and products, merchandise, and other articles duly authorized as aforesaid and not contraband of war, or prohibited by order of the War Department, or the orders of such generals commanding, or other duly authorized military or naval officer made in pursuance thereof."

THE FACTS OF THE CASE, as found by the Court of Claims, were essentially these:

The claimant, Lane, entered into contracts with the treas-

ury agent at Norfolk, Virginia, for the delivery to the agent of a large quantity of cotton, which was upon the Chowan River, in the State of North Carolina, and *within the lines held by the insurrectionary forces.* The commander of the military district gave safe conduct to the claimant, his vessel and crew, to bring out the cotton. The claimant *also had a license to take out certain articles,* a schedule of which was attached to the safe conduct given by the military commander.

The purchasing agent of the Treasury Department of Norfolk appointed a sub-agent to proceed on board of the vessel and to be in charge of the outward cargo contained in the schedule, and not deliver the same to the claimant until he should have delivered to such agent on board the vessel three times its value in cotton. The outward voyage was made without hindrance, and having arrived at Chowan River, the claimant delivered the cotton to the sub-agent on board the vessel.

On her return voyage, the vessel and the cargo were seized by order of a naval commander on duty in the inland waters of North Carolina. After being detained several days, the vessel and cargo were released. She again set off on her course towards Norfolk, and before arriving there was again seized by the order of the admiral commanding the squadron in those waters.

The vessel was afterwards sent to Washington, D. C., where she was libelled, at the instance of the United States, in the Supreme Court of the District of Columbia, sitting in admiralty, where, however, a decree, with costs, passed for the claimant. No record of that suit, however, was produced here.

No proceedings were ever taken against the cotton, and it was ultimately, though after some months' detention, restored to the claimant. It was then taken to New York, but the price of the article had greatly fallen during the detention, and the price received on the sale of it was correspondingly less than if the voyage had not been arrested, and if the cotton had been sold on its prompt completion.

The United States were now called on in the suit to make

good the loss caused by the wrongful conduct of its naval officers.

Upon the facts, the Court of Claims ruled, among other things:

That the contracts with the agent of the treasury, for the sale and delivery of the cotton, were valid and lawful contracts.

That the seizure and detention of the claimant's vessels and cargo, by the officers of the navy, were unlawful and unauthorized.

That the judgment of the Court of Admiralty was conclusive; that the voyage was a lawful and proper one, and conducted according to the prescribed regulations of the trade in which the claimant and his vessel were engaged.

That such acts constituted a breach of the contracts between the claimant and the United States, and entitled him to such damages as he sustained thereby.

*Mr. Dickey, Assistant Attorney-General* (having set forth all the statutes, treasury regulations, &c., bearing on the case, as already given by the reporter, who is indebted for them to Mr. Dickey's brief), *for the appellant; Mr. Hoar, Attorney-General, maintaining the same side:*

1. The voyage was in violation of law, and the contract alleged and the contracts found by the court to have been made were illegal; the seizure, by the naval officers, was proper, and the claimant has, therefore, no just and legal cause of complaint.

The act of July 13th, 1861, the act of March 12th, 1863, the Treasury Regulations of March 31st, 1863, the Revised Treasury Regulations of September 11th, 1863, the act of July 2d, 1864, the Treasury Regulations of July 29th and 30th, 1864, and those of September 24th, 1864, and the President's proclamation of September 24th, 1864, make it plain, that everywhere commercial intercourse with those parts of the insurrectionary States which were within the control of rebels, was absolutely forbidden, from the beginning of the war, unless, indeed, it may be in the act of July 2d,

1864, and the regulations and President's proclamation made thereunder. But these, in truth, make no change in this regard. If it were intended by that act and the practice under it, to license such trade, it is not so specifically provided, and is manifested only, if at all, by the want of express words of limitation in the act. It authorizes the "purchase" for the United States of "any products of States declared in insurrection, at such places therein as shall be designated by" the Secretary of the Treasury. It does not say, expressly, that these provisions relate only to products found within the Federal lines; but is not that the fair construction? Such trade with a public enemy is forbidden without statute, according to the laws of war among all civilized nations; and when that non-intercourse had been so often and so fully proclaimed by all the departments of the government, from the beginning of the war, are we to construe these general words as changing this policy? This construction, limiting the provisions of this act to those parts of the States in insurrection, which were, for the time, within our military lines, is strengthened by the fact that the prohibitions of the act of July 13th, 1861, were extended by the 4th section of this act of July 2d, 1864, *even* "to commercial intercourse by and between persons residing or being within the lines of National military occupation, in districts declared in insurrection" "*with each other.*" This construction is strengthened, too, by the fact, that section 9 of this act repeals so much of the act of July 1861, as made it lawful for the President to license and permit trade by private citizens in such districts, even within the Federal lines, except to supply necessaries to loyal persons, and to authorize persons within the Federal lines to bring to the loyal States products of their own labor, or of freedmen, &c.

This construction is fortified also by the language of Regulation 3 of the Treasury Regulations of July 30th, 1864.

2. The jurisdiction of the Court of Claims depends, of course, upon the acts of Congress which established it; and these, as all know, give it jurisdiction of "all claims founded upon any law of Congress, or upon any regulation of an ex-

ecutive department, or upon any contract, express or implied, with the government of the United States." The only ground which can be pretended here is "contract." But the United States never contracted with the claimant that its naval officers would not seize and detain his vessel and cotton, and claimant has, therefore, no cause of action which the Court of Claims can, within its jurisdiction, enforce.

The grievance or wrong for which this suit is brought was the capture and detention of his steamer and his cargo of cotton by the naval officers, and afterwards by the officers of the Treasury Department. In fact, this capture and detention, which is a *tort*, not anything founded on contract, is the gist of claimant's action.

The Court of Claims, however, have no jurisdiction in cases of tort. Claims arising out of damage to, or destruction of, property in the Southern States taken or destroyed by any part of the army or navy, must be referred to Congress.

*Mr. T. J. D. Fuller, contra:*

1. Lane was the undisputed owner of the cotton prior to, and at the making of, the contract. He agreed to sell, and the United States to buy, this cotton. The price to be paid, the place it was to be delivered at, was agreed upon by the contracting parties.

The law authorized it: the agents of the United States were fully empowered to contract. Whatever some other statutes and regulations may have meant, the act of July 2d, 1864, and the regulations and proclamation under it, permitted what was done. To understand the act we must read it by the light of surrounding circumstances, circumstances found in the public history of the day. The United States, it is to be remembered, wanted cotton at this time, grievously. France and England were so greatly suffering from the want of it, as to be tempted to acknowledge the independence of the Confederate States. The people of the North, themselves, greatly wanted it. Public necessity rendered a relaxation of former rules indispensable. The 8th section of the act of July 2d, 1864, which made it lawful for the Sec

retary of the Treasury, with the approval of the President, to authorize agents to purchase for the Middle States any products of the States declared to be in insurrection, conferred the power to license trading within the military lines of the enemy. The Regulations of September 24th, 1864, which were meant to allow the trading authorized by the act of July 2d, previous, do not adopt the prohibition against non-intercourse contained in the prior regulations of July 2d. They thus show that it was meant to be abandoned.

2. But even if the view we thus take were not correct, the United States are estopped from denying its correctness by the judgment of their own courts. The judgment of the Supreme Court of the District of Columbia, sitting as a court of prize, between the United States and Lane, was on this same subject-matter, to wit, the steamer. The steamer could not be free from liability, and the cotton sub ect to condemnation. The Supreme Court of the District, by restoring the vessel, established the lawfulness of the whole voyage; for if the voyage was unlawful, the steamer would have been condemned. The judgment is, moreover, conclusive upon all the world, and estops the United States from calling in question the legality and regularity of the voyage. It was a judgment of a court of competent and *exclusive* jurisdiction, and binds all the world.

*Reply:*

It is attempted to conclude the whole question by an estoppel of record. But the record set up as an estoppel is not produced. Never favored, an estoppel which seeks to protect—both in the face of general law and special statutes forbidding it—trading with an enemy who is at once an enemy and a rebel—will not be received.

Mr. Justice DAVIS delivered the opinion of the court.

In the view we take of this case it is unnecessary to discuss the question—conceding the contract to be lawful—whether the action of the naval authorities could be a ground of claim for damages for a breach of this contract against the

United States, because, in our opinion, the contract was unauthorized, and had no power to bind the government.

It appears, by the findings of the Court of Claims, that Chowan River, in North Carolina, the place where the cotton was purchased, was within the lines held by the insurrectionary forces, and that the military safe-conduct protected as well the return as the outward voyage, for Lane was permitted to take out an outward cargo, under the supervision of a person, styled in the record a sub-agent of the purchasing agent at Norfolk, whose duty it was to retain possession of the cargo until he should have received from Lane on board the vessel, three times its value in cotton.

At the time this contract purports to have been made, this country was engaged in war with a formidable enemy, and by a universally recognized principle of public law, commercial intercourse between states at war with each other, is interdicted. It needs no special declaration on the part of the sovereign to accomplish this result, for it follows from the very nature of war that trading between the belligerents should cease. If commercial intercourse were allowable, it would oftentimes be used as a color for intercourse of an entirely different character; and in such a case the mischievous consequences that would ensue can be readily foreseen. But the rigidity of this rule can be relaxed by the sovereign, and the laws of war so far suspended as to permit trade with the enemy. Each state settles for itself its own policy, and determines whether its true interests are better promoted by granting or withholding licenses to trade with the enemy. It being the rule, therefore, that business intercourse with the enemy is unlawful unless directly sanctioned, the inquiry arises, whether there was any law of Congress in force at the time that sanctioned this transaction.

At an early period in the history of the war, Congress legislated on this subject. By an act passed on the 13th of July, 1861, all commercial intercourse between citizens of States in insurrection and citizens of the rest of the United States was declared unlawful; but liberty was given to the President, in his discretion, to license trade with the enemy

if he thought it would conduce to the public interests to do so. In so far, however, as it was licensed by him, the manner of conducting it was left to be regulated by the Secretary of the Treasury. In the administration of this law, we do not find any regulation prescribed by the Secretary of the Treasury allowing commercial intercourse within the rebel lines. On the contrary, the trade regulations which were issued by him on the 31st of March, 1863, and the 12th of September of the same year, expressly say that commercial intercourse with those parts. of the insurrectionary States within the control of the rebels is absolutely · forbidden. Has this policy since then been changed? It certainly has, if this proceeding was authorized; for · if Risley in his capacity of treasury agent, could lawfully contract with Lane, a citizen of a State not in rebellion, to purchase from him cotton · in the country of the public enemy, which he did not own or control, but must procure after he got there, and had the power to assist him in this enterprise, by allowing him to take out a cargo of goods to facilitate the purchase of the cotton, and to furnish for his protection a sub-agent and a military safe-conduct, then it is clear the door was left open for general trading with the enemy. If one citizen of a State, not in insurrection, could lawfully obtain from a treasury agent the right to transport goods to a place under the control of the insurgents, where he could exchange them for cotton or other products of the country, and could also have safe-conduct to take his property there, and to bring out the property he should buy, with the promise on the part of the agent to protect and purchase it, so could any other citizen —for in this matter equality must be the rule—and in this way it is easy to see a free commercial intercourse with the enemy would be opened, and a radical change effected in the manner of conducting the war. Was this result contemplated by Congress in the act of July 2d, 1864?

It is contended that the 8th section of this act, which says that it shall be lawful for the Secretary of the Treasury, with the approval of the President, to authorize agents to purchase for the United States any products of States declared in in-

surrection, conferred the power to license trading within the military lines of the enemy.

If this were so, and it was the intention of Congress to allow this trading, providing it was done on government account, why was it not manifested by a specific provision in the law? Why leave such an important change of policy to be inferred from the general words of the act, and the absence of express words of limitation?

That the Secretary of the Treasury, who, it is natural to suppose, having the administration of the law in his hands was, before it was passed, consulted about it, did not give this interpretation to it, is very clear, for, within a short time after the passage of the act, he adopted, with the approval of the President, a new series of rules regulating commercial intercourse, which were intended to supersede all others, and the third rule absolutely prohibits all intercourse beyond our military lines, and declares further, " that no permit will be granted for the transportation of any property to any place under the control of the insurgents." (See Treasury Regulations, and Rules for Commercial Intercourse, of July 29th, 1864.)

It is argued, as the regulations which were issued on the 24th of September following, for the express purpose of enforcing that provision of the act relating to the purchase for the United States of the products of insurrectionary States, do not, in terms, readopt this prohibition against non-intercourse, that therefore it was abandoned. But this does not follow, for there is nothing in these regulations inconsistent with its continuance, and if not expressly revoked, it remained in force. Aside, however, from the construction adopted by the Secretary of the Treasury, we are able to see, by reference to other provisions of the same act, that Congress did not mean to change, by the 8th section, the non-intercourse policy which had prevailed. By the 4th section of this act the prohibitions of the act of July 13th, 1861, were extended *even* to commercial intercourse by and between persons residing, or being within the lines of National military occupation in districts declared in insurrection, " with

each other;" and the 9th section repeals so much of the act of July, 1861, as made it lawful for the President to license and permit trade by private citizens, in such districts, even within the Federal lines, except to supply the actual wants of the loyal people, and to authorize persons within the Federal lines to bring to the loyal States the products of their own labor, or of freedmen, &c.

The incorporation of these sections in the law is irreconcilable with the idea that Congress intended, notwithstanding these prohibitions, to confer power on the Secretary of the Treasury to allow citizens of loyal States on government account to trade within the actual military lines of the insurgents. If this is not the nature of the power conferred, it is asked what authority did Congress intend to give the secretary, and how was it to be exercised? There is no difficulty in answering these questions and reaching the true meaning of this particular provision, when we consider the entire act, and the treasury regulations adopted to carry into effect the 8th section, in connection with the history of the times. The law was designed to remedy existing evils. The mischiefs attending private trading with the enemy, even in those parts of the insurrectionary districts which were for the time within our military lines, had been seriously felt in the conduct of the war, and the best interests of the country required that it should cease. It was deemed important, however, to still maintain some species of commercial intercourse with the insurgents, for it is well known that the government desired to have, if it did not interfere with military operations, the products of the South, and particularly cotton, brought within our lines. To accomplish this end, and at the same time avoid the complications and embarrassments incidental to private trading, required the inauguration of a new system. This was done by withdrawing from the citizen the privilege of trading with the enemy, and allowing the Secretary of the Treasury, with the approval of the President, to purchase through agents, for the United States, any products of States declared in insurrection. The inquiry is made, how could these agents purchase these products if

private citizens were denied the right of trading in the insur-. rectionary districts, whether they happened to be within the National or Confederate military lines?, It would not do to let the army be used for this purpose, and the only other way left open was to hold out inducements for the insurgents themselves to bring their products to us.

If they could be induced to do this, we would obtain their products which we needed, and in the manner of obtaining them, would avoid the evils inseparable from private trading. The inducements for the insurgents to pursue this course were very strong, for besides the liability of having their principal product—cotton—confiscated or destroyed, they were, as is well known, in want of many of the necessaries of life. They were substantially told in the Regulations of the Treasury Department, "If you will bring your cotton within our lines, we will not only not seize it, but will buy it from you, and you are at liberty to go to the nearest treasury agent in an insurrectionary district to sell it, or if you prefer, you can leave it under the control of some one who can go to the agent and sell it for you." If this were not enough to accomplish the object, the President of the United States, by way of further inducement, in an executive order of the same date with the Treasury Regulations, said to them: "You can purchase such articles of merchandise as you need, not contraband of war, to one-third of the aggregate value of the products sold by you, and return with them, and I will guarantee you safe conduct." Why this limited permission to buy, after the delivery of the products, unless the privilege was for the benefit of the insurgents? If private persons, living in the Loyal States, could engage in a venture like this of the claimant, they would need, as he did, to make the venture remunerative, to take with them a cargo of goods to exchange for Southern products; but there was no authority for this. The permission of the President is limited to the taking of a return cargo, bought with part of the proceeds of Southern products, previously sold and delivered to a purchasing agent of the Treasury Department. Indeed, so particular is the direction on this subject, that the

military officer commanding at the place of sale, was not authorized to permit a person who had sold Southern products ·to buy merchandise, unless he exhibited to him a certificate of the purchasing agent, setting forth the fact of the purchase and sale, the character and quantity of products, and the aggregate amount paid therefor.

Enough has been said, without pursuing this investigation further, to show there is nothing in the act itself, the Regulations of the Treasury Department, or the order of the President, to justify Risley in dealing in the manner he did, with Lane. It follows, therefore, that the voyage itself was illegal, as were the contracts and arrangements by which it was undertaken, and that the vessel and cargo were properly seized for being engaged in illegal trading with the enemy.

Although Risley was not authorized in making any contract with a person occupying the status of Lane, still, if he were, he could only do it in the manner and for the purposes pointed out in the Treasury Regulations.

By these regulations the purchasing agent could not act at all until the person desiring to sell Southern products made application, in writing, that he owned or controlled them, stating their kind, quality, and location, and then the power of the purchasing agent before the delivery of the products was limited to a stipulation (the form is prescribed) to purchase, and to the giving a certificate that such application was made, and requesting safe conduct for the party and his property.

There is nothing in the petition, or the findings of the court below, to show that Lane complied with these provisions. On the contrary, it is clear from his own statement that he neither owned nor controlled the cotton when he contracted to sell it, but that, after the contract was made, he procured it within the rebel lines. Neither the law, nor the regulations through which it was administered, were intended to protect a speculation of this sort. The purchasing agent had no authority to negotiate even with any one in relation to the purchase of Southern products, unless at the time of the negotiation he either owned or controlled them.

(See Regulations for the purchase of products of insurrectionary States on government account, of September 24th, 1864, and executive order same date.)

The Court of Claims find that no proceedings were taken against the cotton, and that it was restored to the claimant, but that the vessel was libelled at the instance of the United States, in the Supreme Court of the District of Columbia, where a decree, with costs, passed in favor of the claimant. It is argued, and was so ruled by the court below, that this decree concludes the United States.   But the inquiry arises, how far the United States are concluded by it?   The record of the admiralty court is not before us, and we only know from the record in this case, that that court refused to render a decree of forfeiture against the vessel, and awarded costs against the United States.

On what ground the court put its decision—whether for want of proof, insufficient allegations, or on the merits of the case—we have no means of determining.

It may well be that the United States could not re-seize the vessel, or take further proceedings against the cotton, and yet be at perfect liberty to litigate the right of the claimant to damages, in a direct proceeding brought against them to test that question.

There is nothing in this record to show that the Supreme Court of this District, in decreeing to the claimant the restoration of his vessel, adjudicated on the question of his right to damages.   As that court had the power to award damages —and the record is silent on the subject—it is clear, either that the court refused damages, or that the claimant did not insist on the court considering the question.

The United States are, therefore, not concluded on this point, and the case is relieved of all difficulty.

The judgment of the Court of Claims is reversed, and this cause is remanded to that court, with directions to enter

AN ORDER DISMISSING THE PETITION.