Nelson McStea, Respondent, v. Edward Matthews, impleaded etc., Appellant.

One who has been engaged in carrying on business in the name and ostensibly as a member of a firm, will not be permitted to urge against his own acts, in dealing with third persons, the non-existence of the firm by reason of a want of consent of one of the intended members, although by the articles of partnership such consent was necessary to its existence.

By the implied and express permission of the federal goverment, evidenced by the proclamations of the president at the outset of the war of the rebellion (Proclamations of April 15 and April 19, 1861), and by the act of congress of July 13, 1861, commercial intercourse between citizens of the insurrectionary States and of the loyal States was permitted and was lawful, until the issuing of the president's proclamation of August 16th, 1861, declaring such intercourse unlawful; a co-partnership therefore existing between citizens of the two sections was not terminated, by reason of the war, until that date.

(Argued May 27, 1872; decided November 12, 1872.)

Appeal from the judgment of the General Term of the New York Common Pleas, affirming as modified, in case plaintiff stipulate to modify, a judgment in favor of plaintiff, entered upon a verdict.

The action was brought against defendants as members of the firm of Brander, Chambliss & Co., upon three drafts drawn upon and accepted by that firm, one dated April 13, 1861, for $8,050.60, one dated February 26, 1862, for $1,169.99, and one dated February 26, 1862, for $107.97; also a note signed by the firm, dated January 2, 1862, for $864.25. The defendant Matthews resided in New York, the others in New Orleans.

An agreement was made in New Orleans, on the 27th March, 1861, before a notary public, for the formation of a copartnership *in commendam,* signed by Brander, Jr., Chambliss & Matthews.

It was provided in the agreement that James S. Brander, Sr., the father of James S. Brander, Jr., should be a special partner. Mr. Brander, Sr., was then absent from New Orleans, and in the Island of Nassau. The agreement concluded with these words: " And it is further agreed and understood that a copy of this act shall be immediately transmitted to said James S. Brander, Sr., for his approval; and that in case of his refusal, *the present* contract shall become null and void."

A copy of this article was received by Brander, Sr., at Nassau, and he refused to approve of it.

Matthews remained in New Orleans, taking an active part in the management of the business, until about April 27, 1861.

Upon the trial the court directed a verdict for the plaintiff upon all the causes of action. The General Term decided that the judgment be reversed, unless plaintiff should stipulate to reduce the judgment by deducting the amount of the last two acceptances, and the note and interest, and if he should so stipulate that it be affirmed. The plaintiff stipulated as required, and the judgment was affirmed as modified.

*John Sherwood* for the appellant. That the effect of the war of the rebellion was to dissolve copartnerships between citizens of the north and south, is now well settled. (*The*

*Prize Cases*, 2 Black, 635; *The William Bagaley*, 5 Wallace, 507; *Woods* v. *Wilder*, 43 N. Y., 164; *The Bank of New Orleans* v. *Matthews*, Ct. App. March, 1872; *Griswold* v. *Waddington*, 15 John., 57; 16 id., 438.) The war began April 13, 1861, the date of the attack upon Fort Sumter. A proclamation was not necessary to make it a legal war. (*Swinerton* v. *Col. Ins. Co.*, 37 N. Y.; *The Prize Cases*, 2 Black, 635; *In re Grossmayer*, 9 Wall., 74; *Hanger* v. *Abbott*, 6 id., 635; *The Protector*, 12 id., 700; *The Venice*, 2 id., 274; *Mrs. Alexander's Cotton*, 2 id., 404; *The Wm. Bagaley*, 5 id., 407; *Hanger* v. *Abbott*, 6 id., 535; *Allen* v. *Russel*, 12 Am. Law Reg., 361; *Billgery* v. *Branch*, 17 id., 334.) Defendant is not estopped from setting up the dissolution of the partnership, by his acts after April 13, 1861. (*Coppell* v. *Hall*, 7 Wall., 558.) To constitute an estoppel it must be affirmatively shown that defendant waived the objection. (*Lawson* v. *Brown*, 1 Selden, 394; *Irwin* v. *Concklin*, 36 Barb., 60, and cases; *Jewett* v. *Miller*, 10 N. Y., 402.) This action was commenced during the war by an enemy; he could not maintain an action. (*Sanderson* v. *Morgan*, 39 N. Y., 231.)

*A. F. Smith* for the respondent.

Church, Ch. J. The general question in the case is whether the defendant Matthews is liable as a member of the firm of Brander, Chambliss & Co., upon the acceptance by that firm on the 23d of April, 1861, of the draft of $8,050.06. The other claims for which the action was brought were properly excluded by the General Term. If not dissolved by the war of the rebellion, there can be no serious question of the existence of the firm at that time, and of the liability of the defendant as a member of it. The consent of the senior Brander to become a party to the articles of association as a partner *in commendam*, was not necessary to the liability of the other members to third persons dealing with them, while carrying on the business in the name of the firm. The

defendant Matthews was in New Orleans at the time the draft was accepted, engaged in superintending and managing the business in the name of the firm, and would not be permitted to urge against his own acts the non-existence of the firm, by reason of a want of consent on the part of one of its intended members, although such consent was,.by the articles, necessary to the existence of the firm.

The important point involved in the case is, whether the partnership had at that time been dissolved by the existence of the war of the rebellion. This involves the question whether war existed at that time in the State of Louisiana against the government of the United States, so as to render unlawful all commercial intercourse between the citizens of that State and the citizens of other portions of the country. The court below placed its decision against the defendant upon the authority of the dissenting opinion of Nelson, J., in *The Prize Cases* (2 Black, 635), which maintained, in substance, that, under our Constitution and theory of goverment, the insurrection could not be treated as a war, with its legal consequences, until congress, the war-making power, had declared or recognized its existence, and this was not done until the passage of the act of congress on the 13th day of July, 1861. The majority of the court held that war did exist as early as the first capture, which was May 17th, 1861 ; that the firing upon Sumter, the ordinance of secession of various States, and hostile preparations on the part of the insurgents, together with the action of the president, representing the government in measures to meet these warlike demonstrations, evinced by his proclamation of April 15th, calling out the militia, and the proclamations of blockade of April 19th and 27th, were conclusive evidence that war existed, and that the rights and *status* of the citizens were affected by such war, and that the capture of a vessel owned by citizens of one of the insurgent States was lawful, upon the ground that such owners were public enemies. Without assuming to determine between the soundness of the views contained in the respective opinions, it appears to me proper that, upon a

question of this character, our decision should, if possible, harmonize with those of the federal courts, and we must therefore regard the authoritative decision of the court, rather than the dissenting opinion, even though, as an original question, we should concur with the latter. I cannot, therefore, adopt the grounds upon which the General Term placed its decision. In the late *Case of the Protector* (12 Wal., 700) the same court, in determining what space of time must be excepted from the statute of limitations in bringing an appeal by the war of the rebellion, held that such suspension commenced on the 19th day of April, 1861, the date of the first proclamation of intended bockade. Whilst these and other kindred cases do hold that war existed as early as the 23d of April, 1861, and that certain legal consequences resulted therefrom, they do not cover the precise question involved in this case; and that is, whether, at that date, all commercial intercourse was unlawful by reason of the existence of the war. It is conceded that, according to the law of nations and the common law, one of the consequences of war is the interdiction of all commercial intercourse between the subjects of the two countries, including the dissolution of all partnerships. (1 Kent's Com., 66; *Griswold* v. *Waddington*, 16 J. R., 438; *The William Bagaley*, 5 Wall., 377.)

The reason for this rule is too obvious to require comment. A state of war puts all the members of the two nations in hostility to each other, and pacific trading and intercourse are inconsistent with that condition; but a more important reason is that "It would counteract the operations of war, and throw obstacles in the way of the public efforts, and tend to disorder, imbecility and treason." (1 Kent's Com., 74.) It is equally well settled that this rule may be modified by the sovereign power. Trading may be permitted by any government engaged in war. Every country settles its own policy in this respect, and determines for itself whether it is most for its interest to allow commercial intercourse or not. (*United States* v. *Lane*, 8 Wall., 195.) The right of each

State to permit unrestricted commercial intercourse, or partial licensed trading in specific cases, is apparent upon general principles, and recognized in all the authorities. (1 Kent's Com., 74.) It is pertinent, therefore, to inquire whether such intercourse was permitted by the government; and if so, up to what period. *The Prize Cases (supra)* recognize the acts of the president, prior to the assembling of congress, as the acts of the government, having equal effect upon this question as if authorized by congress. The first proclamation bears date April 15, 1861; prior to which time several of the States had passed ordinances of secession, several of the forts and some public property had been seized, and Fort Sumter had been attacked. The proclamation, after reciting that the execution of the laws of the United States were obstructed by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, made a call for militia to the number of 75,000 men, and contains this clause: "I deem it proper to say that the first service assigned to the forces hereby called forth will probably be to repossess the forts, places and property which have been seized from the Union; and in every event the utmost care will be observed, consistently with the objects aforesaid, to avoid any devastation, *any destruction of or interference with property, or any disturbance with peaceful citizens in any part of the country.*" The terms of this proclamation repel the idea of prohibiting or restricting free business intercourse between citizens of different sections of the country. On the contrary, it pledges protection to property, and the lawful pursuits of peaceful citizens. It seeks only to repossess the property which had been seized, and put down the unlawful combination to resist the laws. The next is a proclamation of intended blockade, bearing date April 19, 1861. The president, in this proclamation, after reciting that an insurrection had broken out in several States, and that a combination of persons threatened to grant pretended letters of marque and reprisal, proceeds to say that, "With a view to the same purposes before mentioned, and to the protection of the public

peace, and the lives and property of quiet and orderly citizens pursuing their lawful avocations until congress shall have assembled and deliberated on the said unlawful proceedings, or until the same shall have ceased," he deems it advisable to set on foot a blockade of the ports of States in which the insurrection existed. Upon the authority of *The Prize Cases,* this was an act of war on the part of the government, and justifiable as a war measure, based upon the existence of a state of war. But so far as it operated as a restriction upon trade, it was confined to the commerce of the ports, and, ostensibly, in preventing the fitting out of vessels to cruise under pretended letters of marque and reprisal; and it expressly assumed to protect the lives and property of quiet and orderly citizens pursuing their lawful avocations "*until congress shall have assembled and deliberated.*"

Nothing is plainer to my mind than the intention, by this proclamation, to avoid any interference with the business relations of the citizens of the country, except so far as the blockade would have that effect until the meeting of congress. It seems incongruous to hold that a proclamation which expressly declares protection to citizens in their lawful avocations should have the legal effect of invalidating all business transactions. The next material act of the government bearing upon this question was the act of congress of July 13, 1861, the fifth section of which declares that, in a certain specified contingency, "it may and shall be lawful for the president, by proclamation, to declare that the inhabitants of such State, or any section or part thereof, where such insurrection exists, are in a state of insurrection against the United States; *and, thereupon,* all commercial intercourse between the same and the citizens of the rest of the United States shall cease and be unlawful so long as such hostility shall continue."

This was the first intimation, on the part of the government, of an intention to prohibit commercial intercourse, while, as we have seen, every previous expression repelled such intention. The fair construction of this act is to regard

it both as an admission of the lawfulness of commercial intercourse, up to that time, and a permission to continue it until the president should issue the proclamation.

It is urged that this act provided merely for a warning or notification to the people that war existed, so that they might know and protect their rights; but this view is inconsistent with the terms of the act. It authorizes an act to be done, the effect of which, if done, is declared to be to prohibit commercial intercourse from the time the act is done.

It does not purport to prohibit such intercourse, nor to declare a state of war, the legal consequence of which would be to prohibit it; but, in substance, it authorizes the president to prohibit it. The language of the act is utterly inconsistent with the claim that such intercourse was then or had been unlawful. In pursuance of this act the president, on the 16th day of August, 1861, issued his proclamation, declaring certain States in a state of insurrection, and that commercial intercourse with the citizens of other States was unlawful. From that period such intercourse became unlawful; and up to that period, by the implied and express permission of the government, it was lawful. If the war had ceased on the 15th day of August, 1861, and the proclamation of the 16th had never been issued, can there be a doubt that the ordinary business relations of the citizens of the respective sections of the Union would have been unaffected?

It may well be that the citizens of the insurrectionary States should be regarded as public enemies for the purpose of enforcing the blockade, and that, where the courts were interfered with so as practically to prevent an appeal, the running of the statute of limitations should be suspended, and that these should be regarded as consequences of an existing state of war; but they are not necessarily inconsistent with the continuance of ordinary business relations, and certainly not with the right of the government to permit such continuance. The language used by the government is capable of no other construction than an intention to permit business intercourse. Such must have been the general under-

standing of the people, and good faith demands, that it be maintained. (*Woods* v. *Wilder*, 43 N. Y., 165.)

The long and sanguinary contest which followed may reflect light upon the nature and magnitude of the preparations which were then made or contemplated to resist the government, but cannot change the legal rights of citizens as they existed by the acts of the government at that time.

That the intention of the government was in accordance with the views above expressed is confirmed by a recurrence to the circumstances attending the breaking out of the rebellion; and these circumstances will also serve to illustrate a distinction which, I think, exists between an insurrection and a war with a foreign nation, as it respects the question under consideration.

There was great doubt, both in official circles and among the people, whether the insurrection would ever reach the magnitude of a war; and it was predicted by prominent officers of the government, looking probably to efforts of conciliation as well as effective force to terminate it, that it would terminate within a specified number of days.

Impressed with this belief or with doubts whether it might not be true, and hoping that it might, and considering the extensive intimate business relations existing between the citizens of the insurrectionary States and the citizens of other portions of the country, and the great injury which would be inflicted upon both classes by a sudden and unexpected interruption of those relations, the government was highly commendable in endeavoring to prevent such interruption until the safety and integrity of the country seemed to demand it. Whilst vigorously resisting the aggressions of the insurgents by the use of ordinary war measures, it wisely postponed, to the latest practicable day, one of the most serious consequences of a state of war, the unqualified interruption of commercial intercourse. The same legal consequences result from a civil as a foreign war. In either, the government has the right to modify and restrict these consequences; but as it respects business relations between citizens of the

same country, existing upon the breaking out of an insurrection, there is much stronger reason, on the part of the sovereign power, to preserve them than in case of a foreign war; because, if the insurrection is suppressed the government has an equal interest in the prosperity of the insurgents as in the loyal portion of its citizens, and an interruption of those relations are equally injurious to both. In cases of insurrection the government possesses both belligerent and sovereign rights, and can exercise both or either, partially or wholly. (100 Mass., 56.) In the late civil war the government hesitated to accept a state of war; and when it did, it preserved, as long as possible, the business interests of the people. This is manifest from the various proclamations of the president, and especially from the act of Congress of the 13th of July, 1861. It follows that, when this draft was accepted, commercial intercourse was lawful by the permission of the government, and that the defendant is liable thereon.

It may be questioned whether the defendant should not, as to this draft, be regarded as a citizen of New Orleans.

Although his legal residence was in New York, yet he had entered into this copartnership some time previously, and at that time was personally superintending the business. That was his business residence, and for aught that appears he then intended to remain. But it is unnecessary to decide this point.

The judgment should be affirmed.

All concur.

Judgment affirmed.