WATTS, WATTS & CO., Limited, v. UNIONE AUSTRIACA DI NAVI-
GAZIONE.

(District Court, E. D. New York.  May 20, 1915.)

1. PAYMENT ⊗⇒16—REQUISITES—PAYMENT BY BILLS OR NOTES.
    By the general commercial law, a promise to pay, whether in the form
of notes or bills, is not the equivalent of payment, unless specially agreed
to be taken as such.
    [Ed. Note.—For other cases, see Payment, Cent. Dig. §§ 63–69; Dec. Dig.
⊗⇒16.]

2. COURTS ⊗⇒1—JURISDICTION—LIMITATIONS.
    The jurisdiction of courts is part of the power inherent in the state by
virtue of its sovereignty, and is susceptible of no limitation not imposed
by the state itself; for any restriction deriving validity from an external
source would imply a diminution of its sovereignty to the extent of the
restriction, and the investment of that sovereignty to the same extent in
some other power.
    [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1–4, 6–9, 91–106;
Dec. Dig. ⊗⇒1.]

3. WAR ⊗⇒16—JURISDICTION OF COURTS OF NEUTRAL NATION—DISCRETION AS
    TO EXERCISE.
    While a state of war existing between two nations does not affect the
jurisdiction of a court of admiralty of a neutral country, the exercise of
that jurisdiction for the enforcement of obligations which arose and were
to be performed outside of that country, and the parties to which are
foreign to it, is not obligatory, but is discretionary, with a view to the
circumstances, and the existence of such state of war may be taken into
consideration.
    [Ed. Note.—For other cases, see War, Cent. Dig. §§ 80–84; Dec. Dig.
⊗⇒16.]

4. COURTS ⊗⇒12—JURISDICTION—EXERCISE THROUGH "COMITY."
    "Comity" is not a rule of law, but a rule of practice, convenience, and
expediency; but where the parties to a suit are not only foreigners, but
belong to different nations, and have therefore no common forum, good
and sufficient reasons should appear to warrant a refusal to entertain the
suit.
    [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 32–36, 40, 41, 43,
45; Dec. Dig. ⊗⇒12.
    For other definitions, see Words and Phrases, First and Second Series,
Comity.]

5. WAR ⊗⇒15—COMMERCIAL INTERCOURSE WITH ENEMY.
    By the law of nations, all ordinary commercial intercourse between
citizens of belligerents, being incompatible with a state of war between
their countries, is absolutely interdicted.
    [Ed. Note.—For other cases, see War, Cent. Dig. §§ 64–79; Dec. Dig.
⊗⇒15.]

6. WAR ⊗⇒16—JURISDICTION OF CONTRACTS BETWEEN BELLIGERENTS.
    Where the law of both belligerent countries forbids a payment by a
subject to a subject of the enemy country during the continuance of a
war, such payment will not be enforced by a court of a neutral country,
which has acquired jurisdiction of property of the debtor.
    [Ed. Note.—For other cases, see War, Cent. Dig. §§ 80–84; Dec. Dig.
⊗⇒16.]

⊗⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty.    Suit by Watts, Watts & Co., Limited, against the Unione Austriaca di Navigazione, etc.    Libel dismissed without prejudice.

This is a libel brought by Watts, Watts & Co., Limited, an English corporation, against the Unione Austriaca di Navigazione, etc., an Austrian corporation, to recover the sum of $45,360, the contract price of bunker coal supplied by the libelant to the respondent's steamers at Algiers, a dependency of the French Republic, before the outbreak of war between England and Austria. Jurisdiction was obtained by a writ of foreign attachment of the respondent's steamer Martha Washington.  The parties have stipulated the following facts:

On November 19, 1913, the parties entered into a contract according to which the libelant undertook to supply bunker coal required by respondent's steamers coaling en route.  Payment was required "in cash at port of delivery, or by due acceptance and payment of captain's draft in sterling on owners at 60 days' sight payable in London."  Pursuant to contract coal was supplied by the libelant to respondent's steamers at Algiers, for which, on the date of delivery, the captains of the several steamers drew drafts in sterling on the owners at 60 days' sight, payable in London.  The following table itemizes the transactions:

| Date. | Vessel. | No. of Tons. | Amount. | Draft Due. |
|---|---|---|---|---|
| 1914 | | | | |
| May  29 | Martha Washington | 606 | £  734:15:6 | Aug.  7/14 |
| June  1 | Kaiser Franz Josef I | 781 | 946:19:3 | "  11/14 |
| 3 | Anna | 112 | 135:16:0 | "  11/14 |
| 5 | Oceania | 572 | 620:16:0 | "  17/14 |
| 9 | Gerty | 192 | 232:16:0 | "  18/14 |
| 15 | Argentina | 290 | 351:12:6 | "  22/14 |
| 18 | Kaiser  Franz Josef I | 992 | 1,202:16:0 | "  27/14 |
| 23 | Campania | 140 | 169:15:0 | Sept.  1/14 |
| 26 | Belvedere | 399 | 423: 3:3 | "  4/14 |
| 28 | Martha Washington | | 972: 8:6 | "  4/14 |
| July  3 | Argentina | 478 | 579:11:6 | "  12/14 |
| 6 | Oceania | 463 | 561: 7:9 | "  12/14 |
| 13 | Kaiser  Franz Josef I | 803 | 973:12:9 | "  22/14 |
| 23 | Martha Washington | 607 | 735:19:9 | Oct.  1/14 |
| | | | £8,641: 9:9 | |

The drafts were duly accepted as payable at Kais. Koen. Priv. Oesterreichische Laenderbank, in London, where the libelant thereafter caused them to be duly presented for payment.  None of them was paid, and all were duly protested.  On August 4th Great Britain declared war against Germany and issued an alien's restriction order on the following day.  The first draft fell due August 7th; the reason given for failure to pay was, "Not sufficient cover."  The second and third drafts became payable on August 11th.  On August 12th a state of war with Austria-Hungary was declared by Great Britain as from midnight of that day; and by a proclamation issued on that day the provisions of a previous proclamation of August 5th prohibiting trade with the German Empire was extended to all commercial intercourse with Austria-Hungary.  The notice of protest of these two drafts, dated August 13th, recites that the premises of the Laenderbank were found closed and the following notice posted: "Owing to the state of war, the business of the London branch of the Laenderbank is necessarily discontinued until its application to his Britannic Majesty's government for a license to continue business has been granted."  Both drafts were also indorsed by the bank, "Insufficient funds."  On or about August 13th Sir William Plender was appointed controller of the London branch of the Laenderbank.  The reason given for failure to pay the next seven drafts, falling due between August 17th and September 4th, as stated in the notices of protest, was:  "We are instructed by Sir Wil-

liam Plender, the controller appointed by the British government, not to make any payments at present." · The answer given on presentation of the last four drafts was, "No advice."

Meanwhile on August 24th this libel was filed, and on the following day process in personam with clause of foreign attachment issued out of this court. The stipulation as to the facts embodies the following subsequent events. By a supplemental proclamation, dated September 9, 1914, Great Britain prohibited specifically, among other things, the payment of any sum of money to or for the benefit of an enemy, or giving security for the payment of any debt, or accepting, paying, or otherwise dealing with any negotiable instrument, held by or on behalf of an enemy, with this proviso: "Nothing in this proclamation shall be deemed to prohibit payments by or on account of enemies to persons resident, carrying on business, or being in our dominions, if such payments arise out of transactions entered into before the outbreak of war, or otherwise permitted." The Trading with the Enemy Act of 1914 (4 & 5 Geo. V, c. 87) was enacted September 18th, in aid of the prior proclamations, and fixed penalties for violations. On the part of Austria-Hungary, an imperial order of October 16, 1914, authorized the government to issue orders to prevent transactions, directly or indirectly, with hostile states, and three General Orders by the Joint Ministry, dated October 22d, pursuant to such authority, prohibited payments, directly or indirectly, to citizens of Great Britain and France and their colonies, and authorized the appointment of trustees to supervise business establishments within the country which are managed or controlled from such hostile states. Finally the respondent summarized the situation, from its own standpoint, in a letter written to the libelant from Trieste on September 19th, wherein its liability for the payment of the amount due was expressly confirmed. "The legal dispositions taken by the British and Austrian governments  *  *  *  prevent us, however, to fulↄ fill our original undertaking. We beg, therefore, to ask you to wait for the payment until normal circumstances will enable us to square our account, eventually to ask you for a suggestion how you would propose to settle this matter, or f. i. whether you would accept a guarantee of one of our first-class bankers in Vienna."

Convers & Kirlin, of New York City (J. Parker Kirlin and John M. Woolsey, both of New York City, of counsel), for libelant.

Lorenzo Ullo, of New York City, for respondent.

VEEDER, District Judge (after stating the facts as above). It appears from the foregoing statement that drafts given by the Austrian respondent for coal supplied before the outbreak of war by the British libelant, payable at the Laenderbank, London, were not paid when due because the respondent had not forwarded the funds to pay them. The reason given by the respondent for its failure to supply the funds was that the state of war which had intervened made it impossible for the respondent to perform an obligation calling for payment to an alien enemy. The embargo imposed by Sir William Plender, the controller in charge of the Laenderbank, upon the payment of funds by the bank, may be put aside. The respondent had not supplied the bank with funds. Moreover, the libelant is not suing upon the drafts; when the libel was filed, only 6 of the 14 drafts had in fact become due. The libelant sues upon the original debt arising out of its performance of the contract.

[1] The respondent's claim that the taking of drafts constituted a novation is without force. The contract between the parties expressly provided for "due acceptance and payment." The drafts were received by the libelant, not in satisfaction of the debt, but as conditional

payment only. Such, indeed, would be the presumption of law in the absence of proof; for by the general commercial law a promise to pay, whether in the form of notes or bills, is not of itself the equivalent of payment. On principle, nothing can be payment in fact save that which is such in truth, unless specially agreed to be taken as its equivalent. The Emily Soudar, 17 Wall. 666, 21 L. Ed. 683.

I pass over various points argued by counsel to consider an issue which lies at the foundation of the case. The respondent contends that this court, as a court of a neutral nation, should not exercise its jurisdictional power between alien belligerents to require an act prohibited alike by the municipal law of both belligerents; i. e., the transfer, by process of judgment and execution, of funds from one alien belligerent to the other. The status of a debt due from one belligerent to another is said to be that of property in the debtor's enemy country, and a neutral court may not disregard the state of war, and by judicial action compulsorily change that status into a payable one. In other words, to take cognizance of this case would be a breach of neutrality.

To this argument the libelant replies that the contract made between the parties specified the place of performance, and it is necessary to consider only whether such performance by the respondent is legal according to the law of that place. And whether that place be Algiers or London, it is clear that, even after the outbreak of war, it was lawful for the libelant to receive, and for their alien enemy debtor to pay them, there the amount due; and if jurisdiction were obtainable there over the respondent the obligation could be enforced there by legal action. Whether such performance would involve a breach of Austrian law is immaterial to this inquiry, since Austria was not the place of payment, and its law does not govern its legality. So far as neutrality is concerned, how can it be a breach of neutrality for this court to decide controversies in accordance with the settled principles of maritime law, when regularly presented to it in accordance with recognized admiralty procedure? How can such enforcement here of legal rights between all belligerent subjects, irrespective of their enemy status abroad, be said to infringe that attitude of impartiality which lies at the foundation of neutrality?

[2] The issue thus presented is one of great importance, and I regret to find that it must be decided without the aid of authority. The researches of learned counsel indicate that it is now presented for judicial determination for the first time. The question is not one of jurisdiction, but of the propriety of the exercise of jurisdiction. This court's power is in no wise limited by the fact that other nations are at war. The jurisdiction of courts is part and parcel of the power inherent in the state by virtue of its sovereignty. The jurisdiction of the state within its own territory is necessarily exclusive and absolute. It is therefore susceptible of no limitation not imposed by itself; for any restriction upon it deriving validity from an external source would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in some other power. The Schooner Exchange, 7 Cranch, 136, 3 L. Ed. 287.

[3, 4] But when parties foreign to a state come before its courts

asking cognizance of obligations which arose and were to be performed outside that state, the exercise of jurisdiction is not obligatory; it is discretionary, with a view to the circumstances. The Belgenland, 114 U. S. 355, 5 Sup. Ct. 860, 29 L. Ed. 152; Benedict's Admiralty, § 195. If jurisdiction is exercised, it is exercised as an act of international comity; if refused, the refusal does not arise out of any incapacity to act. Comity, therefore, is not a rule of law, but a rule of practice, convenience, and expediency. While, however, it is not a matter of absolute obligation, it is something more than mere courtesy and good will. Where the parties are not only foreigners, but belong to different nations, and have therefore no common forum, good and sufficient reasons should appear to warrant a refusal to entertain the action.

When this libel was filed Great Britain and Austria-Hungary were at war. This fact affected materially the relations of the parties. The outbreak of war brings about ipso facto a radical change in the relations of noncombatant subjects as well as of the public armed forces of the belligerent states. Although numerous mitigations have blunted the severity of the old doctrine that a state of war placed the general population of the opposing nations in a condition of active hostility, the subjects of enemy states are still, to a very considerable extent, regarded as enemies. Noncombatants are, or usually have been, in modern times, exempt from most of the severities of warfare; but they are by no means free to act as if no war existed.

[5] The law of nations, as judicially declared, prohibits all intercourse between citizens of the belligerents which is inconsistent with the state of war between their countries. No transaction injurious to their own government may be entered into or continued by them. Ordinary commercial intercourse is therefore incompatible with a state of war, since every act and contract which tends to increase the enemy's resources is absolutely interdicted; and this includes every kind of trading or commercial dealing, whether by transmission of money or goods, or orders for the delivery of either, directly or indirectly, or by contracts in any form looking to or involving such transmission. Every such contract made during the war is illegal and void. Since, however, aid to the enemy is the touchstone of illegality, discrimination is permitted in the case of contracts made before the outbreak of war. Further performance which inures to the aid of, or involves any dealing with, the enemy, is illegal. If from its character the contract is incapable of suspension, it is dissolved; but where such interruption of performance does not go to the root of the transaction, the contract is merely suspended during the war. The alien enemy is not civiliter mortuus; he is merely in a state of suspended animation. When the war ends, the mutual obligations of performance and right of action revive.

Where, therefore, such a contract has been entered into with an alien enemy before the outbreak of war, and has been performed on his side, the war merely suspends his remedy; in other words, he cannot sue upon it during the existence of hostilities. If, on the other hand, performance of the contract is on the side of the other party, he can enforce the contract (particularly such as require for

performance the payment of money only) in the courts of his own country during the continuance of war, provided, of course, a cause of action has accrued. The reason why the rule debarring action on the part of an alien enemy plaintiff can have no application where the parties are reversed is plain. The rule is based upon the obvious ground that it is contrary to public policy for the courts of a belligerent country to render any assistance to an alien enemy to enforce rights which, but for the war, he would be entitled to enforce to his own advantage and to the detriment of his enemy. It is apparent, therefore, that to hold that a subject's right of action in his own country against an alien enemy is suspended, would be to defeat the very object of the suspensory rule, and to turn a disability into a relief.

This is the municipal law of England. Porter v. Freundenburg, 31 Times Law Repts. 163 (Jan. 19, 1915); Robinson v. Continental Insurance Company of Mannheim, [1915] 1 K. B. 155; Ingle v. Same, 84 L. J. K. B. 491; Leader, Plunkett & Leader v. Direction der Disconto Gesellschaft, 31 Times Law Repts. 63; Continental Tyre & Rubber Co., Ltd., v. Daimler Motor Co., Ltd., Id. 178; In re Mary, Duchess of Sutherland, Id. 248; Thurn and Taxis (Princess) v. Moffitt, 84 L. J. Ch. 220; Janson v. Driefontein Consolidated Mines, Ltd., [1902] A. C. 484; Alcinois v. Nigrew, 4 E. & B. 217; Le Bret v. Papillon, 4 East, 502; The Hoop, 1 Chr. Rob. 196; Ex parte Boussmaker, 13 Vesey, Jr. 71; Albrecht v. Sussman, 2 Ves. & B. 323. It is also the law of this country. McVeigh v. United States, 11 Wall. 259, 20 L. Ed. 80; Hanger v. Abbott, 6 Wall. 532, 18 L. Ed. 939; The Julia, 8 Cranch, 181, 3 L. Ed. 528; United States v. Lane, 8 Wall. 185, 19 L. Ed. 445; Briggs v. United States, 143 U. S. 346, 12 Sup. Ct. 391, 36 L. Ed. 180; Kershaw v. Kelsey, 100 Mass. 561, 97 Am. Dec. 124, 1 Am. Rep. 142; Griswold v. Waddington, 15 Johns. 57; Whelan v. Cook, 29 Md. 12. And in the absence of proof of the foreign law, it may be taken to be the law of Austria-Hungary and of France. It is in fact the law common to all nations, since it is merely a formulation of the instinct of self-defense. The apparently contradictory provision of the Hague Convention of 1907 Concerning the Laws and Customs of War on Land, art. 23 (h), whereby it is forbidden to declare extinguished, suspended, or unenforceable in a court of law the rights and rights of action of the nationals of the adverse party, has been construed by the English Court of Appeal to mean, in accordance with its context, merely that the military commander of a belligerent force in the occupation of the enemy's territory is forbidden to make any declaration preventing the inhabitants from using their courts to assert their civil rights. Porter v. Freundenburg, 31 Times Law Repts. 163. The proclamations and orders in evidence are therefore merely declaratory of the common law.

[6] Such being the law common to the belligerents and to the neutral forum, it seems clear to me that it should be recognized and applied in this situation. It is quite beside the point to rely as the libelant does, upon the fact that the libelant could enforce this payment in England if it could find the respondent or any of its property there. That recourse would be available to it under such circumstances as a

particular application of the general rule looking to the impairment of the resources of the alien enemy. But it is because the libelant finds it impossible to reach the respondent or its property in England that it has applied to this forum. From the standpoint of this neutral jurisdiction the controlling consideration is that the law of both belligerent countries forbids a payment by one belligerent subject to his enemy during the continuance of war. This court, in the exercise of jurisdiction founded on comity, may not ignore that state of war and disregard the consequences resulting from it.

The libel is dismissed without prejudice.

<hr>

## THE EROS.

(District Court, E. D. New York. June 8, 1915.)

ADMIRALTY ☞75—DISCOVERY ☞12—PRODUCTION OF WRITINGS—NECESSITY.
    A libelant's motion for discovery of cablegrams and other messages will not be granted, either under the admiralty or the general equity rules, where the libelant has or can obtain originals or copies of all the messages, and all he could gain by discovery would be to establish the authority of the sender and the receipt of the answers, which facts could be established by depositions taken on commission.
    [Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 559, 586, 587; Dec. Dig. ☞75; Discovery, Cent. Dig. § 13; Dec. Dig. ☞12.]

In Admiralty. Libel by Eugene Higgins against the Eros. On application by libelant for discovery. Application denied.

Duer, Strong & Whitehead, of New York City (Selden Bacon, of New York City, of counsel), for libelant.

Convers & Kirlin, of New York City (L. De Grove Potter and George L. Prettyman, both of New York City, of counsel), for claimant.