## THE WYANDOTTE.

(Circuit Court of Appeals, Fourth Circuit.   May 1, 1906.)

### No. 613.

1. SHIPPING—DRAFTS FOR ADVANCES—BOTTOMRY BOND.

Where the master of an English vessel lying in the port of New Orleans ready to sail with cargo was without funds, and was unable to hear either from the owners or the charterers, a draft drawn by the master to raise money for supplies and to pay legal obligations in such port, which was duly discounted at the instance of the ship's agents, was in the nature of a bottomry bond, and created a lien on the vessel enforceable in admiralty.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, §§ 362, 373–376, 391.]

2. SAME—DOMESTIC CHARTER.

Where the master of a foreign vessel lying in the port of New Orleans ready to sail executed a draft in the nature of a bottomry bond to raise money for expenses, the foreign character of the vessel was not affected by the fact that she was sailing under a charter executed in New York.

3. SAME—LIEN—ENFORCEMENT—WHAT LAW GOVERNS.

Where the charter of an English vessel executed in New York provided that it should be governed by the American law, and the vessel shipped her cargo and contracted debts for which a bottomry bond was executed at New Orleans, the liability of the vessel was governed by the law of the United States, and not by the law of the flag.

4. ADMIRALTY—APPEAL—RECORD—EVIDENCE.

On an appeal in admiralty, evidence not made a part of the bill of exceptions will not be considered.

5. SHIPPING—BOTTOMRY BOND—SUPPLIES—DEFENSES—BURDEN OF PROOF.

Where, on a libel in admiralty on a draft in the nature of a bottomry bond given for supplies, defendants claimed that the supplies might have been obtained on the personal credit of the owners, the burden was on such owners to show that they had credit in the port where the bond was executed.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, § 398.]

6. ADMIRALTY—APPEAL—ASSIGNMENTS OF ERROR—FORM.

An assignment that the court erred in not dismissing a libel against a vessel with costs was a mere expression of opinion of counsel as to the duty of the district judge, and not a sufficient assignment of error.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk.

In Admiralty.

For opinion below, see 136 Fed. 470.   Affirmed.

J. Parker Kirlin (Floyd Hughes and Convers & Kirlin, on the briefs), for appellants.

H. H. Little (Hughes & Little, on the briefs), for appellees.

Before PRITCHARD, Circuit Judge, and PURNELL and KELLER, District Judges.

PURNELL, District Judge.   Appellants in their appeal make only three assignments of error, as follows:

"(1) The court erred in holding that the libelants were entitled to recover in the proceedings in rem against the said steamship for any part of the demand set up in the libel.

"(2) The court erred in holding that the libelants were entitled to recover against the steamship in the sum of sixteen hundred and fourteen dollars and fifty-two cents ($1,614.52), with costs, and in holding that said sum, or any part thereof, should have been recovered against the steamship in a proceeding in rem.

"(3) The court erred in not dismissing the libel, with costs."

The libel alleged that in November, 1901, the firm of Baccich & Clement were engaged in the ship brokerage business at New Orleans. During the month the steamship Wyandotte was in the harbor of New Orleans, and was as to them a foreign vessel. The vessel was in need of money to pay her necessary disbursements, and to furnish her with provisions and necessary supplies for the prosecution of her intended voyage, and at the request of the owners of the steamship or her agents, Baccich & Clement furnished certain sums of money to the steamship for the purposes aforesaid, a schedule of which was attached to the libel.

The original schedule is as follows:

New Orleans, November 13th, 1901.
S. S. Wyandotte and Owners, for Hull, England.　In Account with Baccich & Clement.

Disbursements.

| | |
|---|---|
| Consul's fees, 1.25  2.65 | $ 3 90 |
| Towage W. G. Wilmot & Co. | 50 00 |
| Shipwright's acct. J. O. B. Ross | 507 29 |
| Capt. Laurie | 10 00 |
| Ship Chandlery, Woodward, Wright & Co., Ltd. | 6 10 |
| Medical attendance Dr. D. A. Ledbetter | 20 00 |
| Machinists acct. Schwartz Foundry | 17 00 |
| Attendance £10—10@4.87 | 51 13 |
| Surveyor's certificates 5.00, 20.00 | 25 00 |
| Crew notice, Times, Democrat | 3 00 |
| Butcher, Mrs. R. Cobden. 56.60, Northern 99.75 | 156 35 |
| Cash advanced Captain 100, 25 | 125 00 |
| Standard Oil Co. | 15 53 |
| Lambon & Noel | 3 25 |
| Postage and petties | 25 00 |
| 2½% commissions on disbursements | 40 75 |
| 2½ % commissions as per charter 5,700 tons @ 12s/6d., £3562—10= £89 ⅛ @ 4.87 | 435 82 |
| Cables, ours, 17.50, Ocean 3.30, Maritime 6.25 | 26 85 |
| 1¼% ins. on diff. in freight £1235=£13—3—8, @ 4.87 | 75 15 |

$1,614 52

E. J. Richards, Master.

The libel alleged that the charges shown in the schedule were just and reasonable, that the advances and charges were necessary and proper, and were furnished on the credit of the vessel as well as of her owners, and that they constitute a lien on the vessel by the general maritime law.

It was further averred that, in order to pay for these advances and disbursements, the master of the steamship executed his draft or bill of exchange in duplicate, dated New Orleans, November 15, 1901,

whereby he promised to pay to the order of himself, five days after the arrival of the vessel at the port of Hull, England, the sum of £336.7.2 in approved banker's demand bills on London, for value received, for necessary disbursements owed by the vessel at the port of New Orleans, "and for the payment of which he. pledged the vessel and freight."

The original draft is in the following form:

Disbursements.

£336.7/2 stg.

New Orleans, November 15, 1901.

Five days after arrival (or upon the collection of the freight, if sooner made,) of the British S/S "Wyandotte" under my command at the Port of Hull, England, or any other place at which her voyage may terminate I promise to pay to the order of myself the sum of three hundred and thirty-six pounds 7/2 British sterling in approved Bankers demand bills on London for value received for necessary disbursements owed by my vessel at this port for the payment of which I hereby pledge my vessel and her freight and I hereby assign to the legal holder of this obligation all my lien and claim against freight vessel and owners with power to take in my name any and all steps necessary to enforce the same; and my consignees at Port of discharge are hereby instructed to pay this obligation; and deduct the amount thereof from the freight due said vessel; in case of non-payment the holder shall also be entitled to the benefit of all liens in law, equity or admiralty which the master or owners of the vessel may be entitled to against any part of the cargo or its owners for freight compress or other charges on cargo paid by the vessel or master at the port of loading.

This claim to have priority of payment over all others that may be presented against the said freight and vessel.

My vessel is now lying at the port of New Orleans loaded with grain and ready to sail for Hull, England.

Signed in duplicate one being accomplished the other to stand void.

The indorsements are:

Pay to the order of Peter Wright & Sons,

E. J. Richards, Master S/S Wyandotte.

Pay to the order of Henry Schroder & Co.

Per pro Peter Wright & Sons, W. Wright.

[Stamps.]

The answer admitted that the vessel was in New Orleans in November, 1901, and that the master signed a draft in the form set forth; but it denied the other averments of the libel.

The district judge, sitting in admiralty, found the facts to be as stated in the libel; that the ship was owned by the British Maritime Trust, the claimant thereof, and by their representative at New York, on the 24th of September, 1901, was chartered to one W. W. Wilson, as agent for an undisclosed principal, under which she was to proceed to Port Eads for a cargo of wheat or maize, and upon arriving at said port to be loaded at Galveston or New Orleans, as directed by the charterers. The ship proceeded to Port Eads, reaching there on the 10th day of October, 1902, and immediately by telegram advised the charterer of her arrival, and that she was awaiting orders. No orders were given until the 9th day of November, 1902, when the ship was ordered to New Orleans, to which port she at once proceeded, and reported to Baccich & Clement, the charterer's agents, and to whom she

*Baccich & Clement, New Orleans and Galveston.*

was consigned. The loading was concluded on the 15th of November, and she on that day sailed from New Orleans to the port of Hull, England, where the cargo was discharged. Respondent insists that the lay days expired on the 10th day of November, 1902, and that demurrage was due from that day to and including the 16th of November, as well as for time for detention in unloading from December 14th to December 23d, both inclusive. Also, that there was a shortage of cargo of 162 tons, for which she was entitled to recover, and on those two accounts there was due to them a sum in excess of the amount sued for. The charter party provided that the steamer should be consigned to the charterer's agents at the ports of loading and discharge, and should employ their broker to attend to the ship's business; that the cash for the captain's ordinary disbursements at the port of loading were to be advanced, if required—the steamer paying 2½ per cent. commissions and cost of insurance thereon—the amount advanced to be covered by the captain's draft, payable three days after the ship's arrival at the port of discharge out of the freight on which the draft formed a lien. Prior to the captain's departure from New Orleans, a statement was made and duly signed by him of the ship's disbursements, amounting to $1,614.52, for which he drew a draft on November 15th, payable to his own order five days after the arrival of the ship at the port of Hull, England, or wherever else the said voyage might terminate, unless the freight was collected sooner, as before stated, and recited the provisions of the draft. The draft was regularly discounted by the libelants' agents at New Orleans for Baccich & Clement, the agents for the charterers and for the ship at said port, and the proceeds arising therefrom applied to the payment of the ship's bills, as certified to by the master. Prior to sailing, the charterers accounted with the ship's master for the differences of freight due by them, amounting to 1,235 pounds, for which two drafts were given to the ship's master, and duly forwarded by him to the owners of the ship.

The defense interposed by the claimant is that certain items included in the draft, amounting to $702.70, were not claims of a maritime character, and the libel as to them could not be maintained; that under the terms of the charter party the ship's master was limited to drawing upon the freight money, as distinguished from the ship itself; that the claimant should have the right to offset against the draft sued on for any loss sustained either by reason of shortage in the cargo or demurrage; and that the damages in that respect more than covered the amount sued for.

The appellant contends that the instrument set out in the record is a bottomry bond, or a master's draft in the nature of a bottomry bond, and this court concurs in such contention, under the definition of the Chief Justice, who delivered the opinion in the Grapeshot Case, 9 Wall. 135, 19 L. Ed. 651, as follows:

"A bottomry bond is an obligation, executed generally in a foreign port by the master of a vessel for advances to supply the necessities of a ship, together with such interest as may be agreed on, which bond creates a lien on the ship which may be enforced in admiralty in case of her safe arrival

in port of destination, but becomes absolutely void and of no effect in case of her loss before arrival. Such bond carries usually a very high rate of interest to cover the risk of loss of the ship, as well as a liberal indemnity for other risks as well as for the use of the money, and will bind the ship only where the necessity for supplies and repairs in order to the performance of a contemplated voyage is a real necessity, and neither the master or owners have funds or credits available to meet the wants of the vessel."

There is no contention that the Wyandotte was not a foreign vessel. She hailed from and was owned in England, and while chartered in New York this did not and could not change her character in the port of New Orleans. It is equally well settled that the master was without funds, that he could hear neither from the owners or the charterers, and it is not disputed that the vessel had shipped her cargo and was ready to sail. The necessity for supplies seems to be the test, and not, as contended, that every item must be such as would maintain a libel for a maritime lien. It was not necessary, as said by the Chief Justice in the case above cited, to set out each item in the schedule accompanying the master's draft or bottomry bond, and no provision in the charter party could change the general maritime law, or relieve the owners of any lien on the vessel. If this could be done, it would open the doors for unlimited fraud by dishonest masters of foreign ships in the ports of this country. Being a bottomry bond, the claimants had a right to proceed thereon in rem against the property hypothecated, under admiralty rules 17 and 18.

The argument that a bottomry bond is governed by the law of the flag of the ship—an application of the popular saying that the law follows the flag—is without force, since the American law is adopted in the charter party, the vessel was chartered in New York, shipped her cargo and contracted the debts for which the bottomry draft or bond was executed at New Orleans; all in America—an American contract, governed by the laws of America—the United States.

The case of The Lulu, 10 Wall. 192, 19 L. Ed. 906, and The Kalorama and The Custer, 10 Wall. 204, 19 L. Ed. 141, cite and affirm The Grapeshot, 9 Wall. 135, 19 L. Ed. 651; and the doctrine is again declared that in the case of a lien asserted against a vessel supplied in a foreign port, necessity for credit must be presumed where it appears that the supplies for which a lien is set up were ordered by the master, and were necessary for an intended voyage, unless it is shown that the master had funds or the owners had sufficient credit, and that the furnisher or lender knew these facts, etc. Upon this the decision in Re The Grapeshot has been cited in a great many opinions, down to and including The Valencia, 165 U. S. 267, 17 Sup. Ct. 323, 41 L. Ed. 710, Norwegian S. S. Co. v. Washington, 57 Fed. 225, 6 C. C. A. 313; The Bertha M. Miller, 79 Fed. 366, 24 C. C. A. 641, and The Iris, 100 Fed. 106, 40 C. C. A. 301. In fact, the doctrine has never been seriously questioned. Baccich & Clement were, under the terms of the charter party, the agents of both the owners and the charterer, the master was the representative of the owners of the ship and the charterer, and both, with the ship, were in New Orleans, while their constituents were many miles away, and did not respond promptly to telegrams or cablegrams. The exact whereabouts of

neither are definitely disclosed. The ship was ready to sail. Who, then, was better able to judge of the necessity of executing a bottomry draft or bond? The agents and master were without money, either of the owner's or charterers'. True, drafts for the freight money were received by the master, but these drafts are omitted from the record. It is not disclosed by whom they were drawn, upon whom, or to whose order they were payable. They might or might not have been collected, but there is no satisfactory evidence as to those drafts, except that they were for freight, and were forwarded to the shipowners. The inference is they were payable to the owner's order. Like many exhibits necessary to a full understanding of the case referred to in the depositions and argument, they are not in the record. The record is in this respect unsatisfactory, does not comply with the rules or the stipulation of proctors, which includes expressly the exhibits as a part of the record to be sent to this court. Even the charter party is handed up in detached sheets, and not included in the record. Evidence not made a part of the bill of exceptions, though appended, is not regarded by the Supreme Court. Bank v. Kennedy, 17 Wall. 19, 21 L. Ed. 554; Mays v. Fritton, 20 Wall. 414, 22 L. Ed. 389. Admiralty seeks to do natural equity and justice is as a rule untrammeled by strict technical rules, and, of necessity, is liberal in the construction of contracts. The funds realized on the bottomry bond or draft were used in paying claims against the ship—claims created by the agents and master in good faith for what under the circumstances they deemed necessities. The owners and ship received the benefit, and it is just and equitable they should be held responsible. The objection to a bottomry bond that the supplies might have been obtained on the personal credit of the owners is not new, but it is settled that, when such defense is set up, the burden is upon the respondent to show that such owner or charterer had credit or funds at the port where the master obtains the supplies, etc., or executes the bottomry bond. This was held in' Re The Virgin (in 1834), 8 Pet. 538, 8 L. Ed. 1036, and which has been cited with approval on this principle in Re O'Brien v. Miller, 168 U. S. 287, 18 Sup. Ct. 140, 42 L. Ed. 469,·The Grapeshot, 9 Wall. 139, 140, 19 L. Ed. 651, and The Lulu, 10 Wall. 192, 19 L. Ed. 906. There was no attempt to show the owners had credit at New Orleans.

This disposes of the first two exceptions, and, without quoting from the opinion of the district judge, which we adopt, is conclusive of the case. Appellants, while only taking three exceptions, divide the argument into five heads, and make an argument which is technical, academic, and interesting, but without controlling force.

The third exception is more the expression of opinion of counsel as to the duty of the district judge than an exception. Under the rules governing the practice in appellate courts, and especially under the rules of this court, we cannot concur in this expression of opinion, but for the reasons stated affirm the decree entered by the district court.

Affirmed.