## THE LAUNBERGA.

(District Court, E. D. North Carolina. June 20, 1907.)

1. SALVAGE—RESCUE OF DISABLED BARK FROM SHOALS—GRADE OF SERVICE AND COMPENSATION.

The Norwegian bark Launberga, with a cargo of lumber, encountered a storm when between Pensacola and the Bermudas, in which her rudder and steering gear were damaged, and she turned westward to reach a port for repairs. September 21st she struck on Frying Pan Shoals, off the mouth of Cape Fear river, with such force as to turn her over on her side, and her masts and rigging were cut away. She then righted and drifted into deeper water in a slough in the shoals, where she anchored. The next day the fishing steamer Wharton, a powerful vessel with a 1,000 horse power engine, came to her assistance, and with the assent of her master took her in tow, and after 12 hours brought her into port with her cargo. Owing to the fact that the storm had drifted away the light-ship and shifted the buoys marking the shoals, and also that the bottom is continually shifting, the task of extricating the bark and taking her into deep water was one of considerable difficulty, and in its performance she again struck and suffered further injury to her bottom. The weather was very calm, and the sea smooth, and remained so for two days thereafter. The bark was in a position of peril from which she could not extricate herself, but there were other steamers and tugs available by which she could have been rescued within a few hours. Her value as salved was $3,100, and that of her cargo $11,000. The value of the Wharton was $40,000, and she had a crew of 24 men. *Held*, that the service was one of salvage, but of low order, as there was no especial danger to the steamer or her crew; that she was not chargeable with fault or want of skill or care in handling the bark in the shoals under the circumstances; and that she was entitled to a salvage award of $2,000, one-fourth to be divided among the crew, and to a further allowance for standing by and pumping the bark after reaching port.

[Ed. Note.—For cases in point, see. Cent Dig. vol. 43, Salvage, § 72.

Awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

2. SAME—DERELICT DEFINED.

A vessel which, although disabled, has not been abandoned by her officers and crew, is not a derelict, and salvage for her rescue cannot be awarded on that basis.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, § 7.]

3. SAME—BOTTOMRY BOND—SUBORDINATION OF LIEN TO CLAIM FOR SALVAGE.

A bottomry bond, while a valid lien in admiralty, is subordinate to a claim for salvage of the vessel.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, § 105.]

In Admiralty. Libel for salvage.

Russell & Goodman, for libelants.

Rountree & Carr, for claimants.

PURNELL, District Judge. By a libel in rem filed September 24, 1906, the Cape Fear Fisheries Company, "a corporation duly chartered and doing business under the laws of North Carolina" as "owner by lease" of the fishing steamer Joseph Wharton, and J. M. Marran, master of said fishing steamer, for themselves and all others entitled against the bark Launberga, her tackle, etc., and cargo, for salvage. The libel alleges, omitting formalities, that the steamer, on the morning of September 22, 1906, being outward bound from the Cape Fear river, discovered a vessel "apparently flying a flag of distress" grounded on

Frying Pan Shoals, in a perilous position, and upon approaching discovered it to be the Norwegian Bark Launberga. The Joseph Wharton is a tug of exceptional power, having a capacity of about 1,000 horse power, and by the exercise of the full power of the engines of the tug and the best skill and endeavor of the captain and crew succeeded in saving the bark without the loss of any of her cargo, and towing her to a harbor of safety, at Southport. Services rendered are then given, value of cargo, etc. Bonds and stipulations were filed and on the 24th of September, 1906, the monition issued, directing the marshal to attach and hold in custody the bark Launberga, her cargo, etc. On October 30, 1906, G. O. Johnson, as "agent for the owners of the bark Launberga and bailee of the cargo laden thereon," intervened, and prayed to defend accordingly, and filed a stipulation for cost. On November 3d, claimants filed exceptions to the libel, alleging that the interest of the libelant Fisheries Company in and to the Joseph Wharton does not sufficiently appear therein; nor does it appear other parties are not interested in or entitled to any award which may be made for the salving services of said tugboat, should any such award be made. On November 7, 1906, said G. O. Johnson intervener as aforesaid, filed a formal verified answer admitting some of the allegations in the libel and controverting others, and at the close of said answer propounds certain interrogatories "to be answered under oath by libelants" as follows: First. What person or corporation holds the legal title to the fishing steamer Joseph Wharton? Second. Is the Cape Fear Fisheries Company the alleged owner by an oral or written lease of said fishing steamer Joseph Wharton? (a) If under an oral agreement, what are the terms thereof? (b) If under a written agreement, state what are the terms and conditions thereof, or annex a copy of said written agreement to your answers to these interrogatories?

On November 3d, on motion of libelants' proctors, assented to by proctors for claimants, an order or decree to operate as a writ of venditione exponas was entered directing the marshal to sell the vessel and cargo separately on Monday, the 12th day of November, 1906, allowing time to proctors for claimants to file pleadings, answers, or claims, and referring the issues made by the pleadings, answers, or claims to E. S. Martin, Esq., who was therein appointed commissioner under United States Supreme Court rules in admiralty No. 44, to take the testimony and report the same to the court, together with his conclusions of law and fact. The marshal reported, November 12th, that the sale as ordered had been duly made on that day, the vessel purchased by L. H. Skinner for $3,100, and the cargo for $10,000, and the purchase money paid into court. The sale was by consent in writing of proctors both of libelants and claimants, confirmed by the court, and the marshal ordered to execute and deliver to the purchaser bills of sale in due form. On March 26th, the commissioner named in the consent order of November 3d, hereinbefore referred to, terminated the hearing and signed his report, which is entered as filed April 12, 1907. On January 26th, a claim of the Franklin National Bank of Philadelphia was filed with the clerk for £81 sterling, based on an obligation given by G. O. Johnson, master of the Launberga, to the

American National Bank, Pensacola, Fla., for "necessary disbursements owed by said vessel," and pledging the vessel and her freight at the port of discharge (Rio Janeiro or any other place at which her voyage may terminate) a bottomry bond executed by the master of a vessel in a foreign port for necessary disbursements owed by the vessel. This claim does not seem to have been called to the attention of the commissioner and is not referred to in the report. To the report of the commissioner, libelants file 11 exceptions as to the findings of fact, and further except to conclusions of law, as set out in the report and numbered 1, 2, 3, 5, 8, 10. No other exceptions to the report have been found in the files.

After carefully reading over the testimony, the court is of opinion that there is not such erroneous findings of fact as would justify a reversal of such findings. They seem to be justified by the written testimony, in which there is unusually little conflict. The narrative of the disaster seems to be as follows: The Norwegian bark Launberga, G. O. Johnson, master, drawing 22 feet, sailed from Pensacola, Fla., in August, 1906, bound for Rio Janeiro, South America, loaded with a cargo of lumber. She encountered a storm between Pensacola and the Bermudas on September 16–17, 1906. The rudder and steering gear were damaged, and after the storm the bark stood to westward to make a port and repair damages; the nearest port being Wilmington or Southport, N. C. On September 19th, the light on Bald Head was sighted, but the bark could not get into Southport, as the wind was southerly, and the bark had to beat up, tack back, and on the 21st, about 4 o'clock in the afternoon, she struck on the western side of Frying Pan Shoals about 14 miles from Bald Head light, which bore from the vessel N. N. W. ½ W. The light-ship usually stationed at the southern point of Frying Pan Shoals had been blown away by the storm of September 17th, and the buoys had also been blown or driven out of position by the storm referred to. The ship went hard aground, bumped, and rolled over on her side, when it was decided to cut away the masts and rigging, which being done, the ship righted. The lifeboat was then lowered and provisioned as required by the Norwegian law and custom, and to be ready for use in case the ship should go to pieces during the night, and it became necessary to leave her.

After the masts and rigging had been cut away, the ship lightened, and about 8 o'clock p. m. drifted into deep water in a slough five fathoms deep. The anchor was at once let go, and the ship remained in the slough all night, easily riding at anchor, without bumping, striking, or getting aground; the weather being fine, the sea smooth, and little or no wind. There were 25 inches of water in the hold of the vessel when she was anchored, and she did not leak during the night and was tight. None of the officers or crew at any time left or abandoned the bark, but remained on board the whole time and until some time after the bark was towed to Southport and after the United States marshal had seized her. The place where the bark lay in the slough was about 16 miles from the land.

The Launberga was sighted by the keeper at the life saving station on Bald Head Island, and he set a flag on the light tower to notify the

other life saving stations and the tugboats in the Cape Fear river that there was a vessel on Frying Pan Shoals. The steamer Joseph Wharton, M. J. Marran, master, in the employ of the Cape Fear Fisheries Company, libelant, engaged in the fishery business, was in the Cape Fear river some miles above the mouth, and on the morning of September 22, 1906, started down the river to go to sea to fish, when the pilot saw the flag on the light tower and informed the captain of the steamer that there was a vessel on the shoals. After going out to sea some distance, the steamer spied the bark Launberga apparently ashore with her masts and rigging gone. The steamer ran down to the usual position of the knuckle buoy, and when she got there found that the buoy was 1½ miles or more westward of the course the steamer was on. The usual course the Wharton pursued in going out to sea to fish was to run down to this buoy, and then sometimes across the shoals through a slough, to shorten the distance to sea; but on this day, the buoy being out of place, neither the captain nor pilot of the Wharton knew exactly where they were, and the captain directed the pilot to haul the steamer until she bore E. by S., and she ran this course slowly under one bell and sounding until she reached the bark at anchor in the slough. When the steamer arrived near the Launberga about 9:30 or 10 o'clock a. m., a small boat was launched from the steamer containing the mate, pilot, and one man from the crew of the steamer, and sent alongside the bark. The mate of the steamer asked the captain of the bark if he wanted help, and he said, "Yes." The mate then asked if he had a good hawser, and he said, "Yes," and the mate told him to get it out and heave up his anchor at once, and the captain of the bark replied that he would slip the anchor, which he did, and the hawser was passed from the Launberga to the steamer, being a new hawser and in good condition.

At the time the Joseph Wharton reached the Launberga, she (the Launberga) was riding easily at anchor in the slough in five fathoms of water on the N. E. side of the shoals, and surrounded by shoals; there being little or no sea or wind, and the water very smooth.

The hawser from the bark, 75 or 80 fathoms long, was taken aboard the steamer Joseph Wharton and made fast, and the captain and pilot of the Joseph Wharton consulted as to the course to steer, as there was nothing to guide them, the light ship being gone, the buoys out of place, and no land in sight, and stated to the captain of the Launberga that they did not know how to get the bark out of that hole, and the captain of the Launberga pointed in an easterly direction as being the way he thought was the best way out, and the pilot said he would try to get out the other way, and finally the captain directed the pilot to steer S. S. W. in order to shorten the distance over the shoals. The steamer then steered under one bell S. S. W. very slowly, throwing out the lead at the same time, and shoaled the water up, and put her helm hard aport, and swung the steamer around to N. W., and the Launberga shot ahead before she was turned and struck upon the shoals, struck twice pretty hard, as she rose on the swell or sank when it passed, and after getting her off the shoals, the steamer turned the bark around, all of which took some time, about two or three hours, and got her back into the slough where she was before.

After turning the bark, the life saving crew reached the bark and found the Joseph Wharton had the bark in tow and was just maneuvering her, pulling her a little that way and this way and swinging backwards and forwards, and the pilot of the steamer asked Capt. Watts, of the life saving crew, if he could give him any idea where he was, as he did not know, and Watts replied that he thought the steamer was on the N. E. knuckle, and would have to go to eastward, and the pilot said that an E. by S. ½ S. course would give the boat water to eastward. The mate and a man were then sent for the first time out from the steamer in a small boat ahead of the steamer 100 or 200 yards, sounding on that course, and the steamer with the bark in tow ran that course, moving slowly ahead and ran out of the 5 fathoms slough onto 4, then 3½, and then 4 fathoms, and continued on, the bark striking and thumping heavily several times in passing over the shoals; and while thumping, as aforesaid, a part of the keel, about 25 feet long, came up alongside of the bark. It required about 1½ or 2 hours to get off the shoal. After getting over those lumps, the water continued to deepen until it was 6½ fathoms, when the small boat was called in, but the sounding continued from the steamer until the watch buoy (where the light-ship should be) was sighted, when the steamer hauled around and continued her course to Southport, N. C., arriving there with the Launberga in tow between 9 and 10 o'clock p. m. and anchored the bark in the river. The ship steered fairly well while being towed.

The tow line was parted twice—once when the bark was on the shoals, and again on the way outside of the bar while towing under full speed. The bark had 25 inches of water in her hold at the time the Joseph Wharton reached her, and when she got aground, while being towed by the Joseph Wharton, she commenced leaking again, and had about five feet of water in her hold when she reached Southport. The steamer made no soundings before starting to tow the Launberga, nor until after the bark had struck bottom the first time, when the steamer put out her small boat to sound, as before stated. The weather was fine and the sea smooth for two days before the bark ran aground, during the time she lay in the slough at anchor, while the Joseph Wharton had her in tow, and for two or three days after she reached Southport.

Frying Pan Shoals extends to sea under the water about 16 miles southward from Bald Head light; the light-ship being stationed at or near its southern or southeast end, and the knuckle buoy being 7 miles inside of the light-ship in a N. W. ½ W. direction and the watch buoy at the light-ship stand or anchorage. Frying Pan Shoals is a very dangerous place, lumpy in spots and shifting bottom; different depths of water over different places; 11 feet and from that to 3 or 4 fathoms; one day 2½ or 3 fathoms, and the next day 12½ to 13 feet. It was almost impossible to tell where the shoals, sloughs, or anything else were on that day, as there was no sea, and it was perfectly smooth on the shoals. If there had been a sea on, they could have told a great deal better where the shoals and sloughs were. No man can tell with any degree of accuracy the condition of water and bottom on the shoals; nor is any chart correct for any time, as the bottom shifts. The shoals

are considered by mariners about the worst shoals on the coast, and are much dreaded by seamen.

There was some risk in going across those shoals with the Wharton or any other steamer, the light-ship and buoys being gone, and yet the risk was not great on that day, as the weather was of the finest, the sea smooth, and no wind, and the captain of the Wharton himself testified that, had it not been the finest kind of a day, he would not have gone in there. "The risk is that the bottom is so uneven, and there are so many wrecks scattered along the shoals, that it is impossible to know when your vessel may get into two fathoms or strike a wreck, as the shoals are full of wrecks." Usually there is stormy weather in September. Had a storm before and another after the Launberga got aground, the winds being easterly, though the weather was fine from two days before to two days or more after the 22d of September, 1906.

The Joseph Wharton is a fishing steamer, owned by the Fisheries Company, and leased and operated by the Cape Fear Fisheries Company, the libelant, which company controls her and pays her officers and crew. The Cape Fear Fisheries Company operated a fishery, situated on the west bank of the Cape Fear river, about 12 miles above Southport, and the Wharton, with the other steamers belonging to said company, go out to sea to catch fish for the fisheries, remaining out at sea generally from three to four days. The Wharton, in going out to sea to fish, usually ran out of the bar or mouth of the Cape Fear river down to the knuckle buoy, and then sometimes across the shoals through a slough towards the eastward or south, to save distance to sea; but, the buoy being out of position on September 22d, the captain sounded, and then ran an E. by S. course until he reached the Launberga.

The Joseph Wharton is about four years old, valued at $40,000, a 1,000 horse power engine, 16 high pressure, 32 low pressure, 24 stroke, steam pressure about 145 pounds, draws 10½ feet when still, having a master, mate, pilot, and other officers and crew, 24 in number.

The Cape Fear Fisheries Company had four steamers operating at this time, September 22d, and another fishery company near operated one or two. There were no tugs, except the Blanche and Marion or fishing boats, except the Wharton and Lawrence, at or near Southport on the morning of September 22d; but the fishing steamers returned that night. The Blanche and Marion were in the river, and the Jones at Brunswick, Ga. The Wharton is a very powerful boat and could tow the other three boats of the Cape Fear Fisheries Company. The Dye and Saunders, fishing steamers belonging to the Ocean Fisheries Company, have no power in towing. The Marion is a steam tug of 150 horse power doing a towing business in the harbor of Wilmington and outside the bar, and the Blanche is also a steam tug of about 150 horse power with her place of business at Southport, doing a towing business from the bar, and both of said tugs were at or near Southport on the 22d of September, 1906. The Blanche has more power than the Marion, but her boiler is in bad conditon. The Blanche and Marion, or either of them, could have taken the Launberga from Frying Pan Shoals and brought her into the river on September 22d, 1906, as the circumstances were very favorable; there being no wind, and

the sea smooth. Both of said tugs, the Marion and Blanche, have pulled vessels off of Frying Pan Shoals and Cape Lookout Shoals. The Wilmington is a passenger boat, but accustomed to pull schooners off that were aground in the river or bar or outside on the shoals, but she was at Wilmington on that day. The Rescue, a powerful tug of about 1,500 horse power, belonging to the Merritt & Chapman Company, of New York, was not in these waters when the Launberga was wrecked, but came here soon after. Many powerful boats, 25 or 30, are at Norfolk, and some of them had come down to wrecks on the Carolina coast on two occasions. It requires about 16 hours to run from Norfolk to the Frying Pan Shoals. There are also tugs at Georgetown and Charleston, S. C., which could have reached said shoals from those places in about 12 hours. Capt. Johnson of the Launberga could have taken his boat and gone from where his vessel was lying to Southport and secured a tug from the fisheries company, or from Wilmington, to come down and tow his bark in.

The pump aboard the Launberga was broken by the masts and rigging when they fell and could not be used. After the Wharton anchored the bark in the river at Southport, the engineer and crew of the Wharton repaired the pump and used it, which could keep the bark free of water with a sufficient force of eight men, and to keep her afloat she was continually pumped out with the Wharton's steam pumps until a boiler was put aboard the Launberga October 3d. September 23d, the Wharton went to Wilmington and secured a steam pump and kept her free until the boiler was put aboard. The Wharton pumped her from September 22d to October 3d. A tugboat was also secured to lay alongside of her constantly and pumped her for a short while. The Wharton also furnished coal and water for the boiler and a man to run the engine.

The Launberga, when in said slough, where she was when the Wharton reached her, was dismasted, and in a condition of peril and distress, not able to get out of danger by her own efforts, even if the weather had been certain to continue favorable for many days. The services rendered the Launberga by the Wharton and crew were salvage services, but of a low grade, involving some risk to the steamer of the libelant, but little more than she had taken before in the pursuit of her business of fishing, no particular peril of life or limb, no unusual expense, and no gallantry, courage, or heroism; and the lives of the officers and crew of the Launberga were in no immediate danger or peril. The time employed in said salvage service was about 12 hours. That the Wharton failed to exercise proper skill and prudence in attempting to move the Launberga under the circumstances, without first sounding around her and endeavoring to find a safe passage out, and by this negligence caused her to strike on the shoals, which might have been avoided if she had diligently sounded before starting to tow her.

The values of the bark Launberga and her cargo, as salved, were as follows, to wit:

Value of bark Launberga........................................... $ 3,100
Value of cargo..................................................... 11,000
                                                                 ---------
    Aggregating ................................................. $14,100

For which the vessel and cargo were sold, and which it is agreed in writing by the proctors shall be fixed as the true value thereof.

The commissioner finds: The Fisheries Company of New York by an instrument in writing without date duly released to the Cape Fear Fisheries Company (the libelant) all its rights, title, and claim to the salvage service performed by the steamer Joseph Wharton in saving the bark Launberga aforesaid, and all interests whatsoever in any claim for compensation for such salvage service. The Launberga as she lay in said slough was not without the prospect of other efficient means of assistance, as she was near the usual track of vessels going in or out of the Cape Fear river and of tugs seeking towage employment and the rescue of vessels in distress. The libelant the Cape Fear Fisheries Company incurred certain expenses after the Launberga had been anchored in the Cape Fear river in order to keep her afloat, and filed a bill for the same amounting to $707.37, $705.37 of which the commissioner, after allowing the several items, allows, and also a bill of $54.00 board of caretaker.

Only such conclusions of law excepted to need be discussed. They are:

(1) That the service rendered by the libelant steamer the Joseph Wharton, its master and crew, to the bark Launberga, was salvage service of a low grade.

The exception to this conclusion seems to be as to the grade of service. Minds may differ as to the grade of a salvage service; but from the decisions, especially that of the Circuit Court of Appeals of this Circuit in The Penobscott, 106 Fed. 420, 45 C. C. A. 372, the court concurs in the conclusion of the commissioner that the service rendered was salvage service of a low grade. It involved no great risk of life or property. "There was no real peril either to the property of the salvors or to the lives of any one employed on either vessel," as said in the opinion in the case cited.

(2) That the Launberga was never abandoned by her crew, nor any of them, nor was said vessel at any time in any sense of the word a derelict.

In the brief for libelants, it is insisted earnestly that the bark was a derelict. In re The Myrtle Tunnel (D. C.) 146 Fed. 324, a marine disaster which occurred on the same shoals, Judge Brawley, one of the most learned admiralty lawyers in this jurisdiction, has ably discussed the definition of a "derelict," an essential element of which is that the boat must be abandoned. The derivation of the word, from "de linquere," and the definition given in the dictionaries indicate the same meaning, to leave, to abandon, a ship abandoned at sea. That the vessel was in a dangerous position in the event of a storm there can be no question, but there is no evidence she was ever abandoned, even admitting the argument that the captain and crew intended and prepared to leave her, when the small boat was lowered. Hence she was not a derelict. This exception, which it appears from the argument, no grounds therefor being given in the exception, which is general, broadside, is based on the idea that the Launberga was a derelict, is overruled, and the conclusion of the commissioner affirmed.

(3) That the Wharton failed to exercise proper care, skill, and

prudence in attempting to move the Launberga, under the circumstances, without first sounding around her, and endeavoring to find a safe passage out.

I cannot concur in this conclusion. Of course, the officers of the Wharton might have acted with more skill and prudence, selected a shorter, safer, or better passage out, all of which with the chart and clear "back sights" in the courtroom at Wilmington can be wisely demonstrated by even a second-class seaman: but on the sea, without light-ship or buoys, or landmarks to steer by, it seems, looking at the chart and soundings and the testimony as to shifting sand bars, the Wharton took about as safe, short, and prudent a course as could have been selected. Under all the circumstances of the case, it appears this conclusion is not justified. The additional soundings, which it seems should have been made, it does not seem would have disclosed to those on the rescuing tug any better course to have been taken. This exception is therefore sustained.

(5) That the court should award to libelants for said salvage services the sum of $2,000; one-third thereof to the officers and crew of the Joseph Wharton in proportion to their wages, as set forth in the report, and the remaining two-thirds thereof to the Cape Fear Fisheries Company, the lessee of said steamer Joseph Wharton, and assignee of the owner's claim for salvage.

Libelants in their brief earnestly insist the award should be 50 per cent. of the salved property. The award in salvage cases is largely in the discretion of the court. In The Penobscott, 106 Fed. 421, 45 C. C. A. 372, the Circuit Court of Appeals, on appeal from this court, which had made an award of $2,000, affirmed the decree, but reduced the award to $1,000, said:

"When we look at the danger to life and property, to which we have already referred [there was less danger in the present than in that case], and when we recall that the property saved did not exceed in value $8,000, and that the time the Wilmington was engaged in the work of rescue, we are impelled to the conclusion that an allowance of $1,000 for salvage is, under all the circumstances of this case, fair to the salvors and to the schooner so rescued."

Applying the same rule, considering the amount involved, and all the circumstances of the case, this court is impelled to the conclusion that $2,000 for salvage services, especially in view of the bill for expenses which must be allowed, is just, even liberal, to the salvors and fair to the bark rescued. The exception to this conclusion is therefore overruled, and the conclusion of the commissioner affirmed. The court is, however, of the opinion that the allowance of one-third of the award to the members of the crew and two-thirds to libelants the Cape Fear Fisheries Company is too liberal to the crew, who were working for wages, ran no eminent risk, and were not called upon and did not perform any acts of heroism, daring, or courage. Hence, considering all the circumstances, this conclusion is modified as to distribution in which one-fourth of the award will be allotted to the members of the crew of the Joseph Wharton, and three-fourths thereof to the Cape Fear Fisheries Company, as owner by lease of the steamer Joseph Wharton.

(8) That libelants should have judgment for the sum of $2,000 for salvage services, to be distributed as before stated in the fifth conclusion of law, and for $705.37, expenses as aforesaid.

This exception, for reasons before stated, is overruled, and the conclusion modified as hereinbefore in considering the exception to the commissioner's fifth conclusion.

(10) The tenth paragraph, under the heading of "Conclusions of Law," is a recommendation that judgment be rendered as before recommended to be paid, together with costs out of the proceeds of sale of the vessel and cargo now in the registry of the court.

The exception to this conclusion, for reasons hereinbefore stated, is overruled, and the tenth conclusion of the commissioner affirmed.

The interrogatories propounded by claimants under the admiralty rule No. 32 of the Supreme Court, which have been held to have the force of a statute, were proper, and called for information to which claimant was entitled. The rule provides:

"In default of due answer by the libelant to such interrogatories, the court may adjudge the libelant to be in default and dismiss the libel, or may compel his answer by attachment, or take the subject-matter of the interrogatories pro confesso in favor of the defendants as the court in its discretion shall deem most fit to promote public justice."

Libelant did not answer the interrogatories, and there does not seem to be any specific manner in which this shall be done, but at the hearing produced a paper writing signed by another corporation, and the commissioner finds as a fact, which did answer the interrogatories by showing a legal right to claim any award which might be made for salvage services performed by the steamer Joseph Wharton, which seems to have been satisfactory to the proctors for claimant, and, no exception being filed to such finding, this is adjudged to be a sufficient compliance with the requirements of the admiralty rule.

The claim of the American National Bank filed on January 26th, pending the hearing before the commissioner, but not referred to in the report or ever called to the attention of the court, but found in the papers indorsed as filed January 26, 1906, seems to be a derelict abandoned, but being in the files, and apparently a legitimate claim, should be passed upon. This is a bottomry bond. In re Wyandotte, 145 Fed. 321, 75 C. C. A. 117, and authorities cited. It is a valid lien in admiralty, but is not of the highest order, i. e., it is subordinate to a claim for salvage. If the ship be lost during the voyage, the claimant under a bottomry bond loses his claim. For this reason, the risk, a high rate of interest is usually allowed. This bond is a lien on the surplus of the proceeds of sale after the payment of the salvage award and the costs. But for the salvage service, if the ship had been lost, there would have been nothing to which the bottomry bond would attach. It is a pledge of the ship and her freight when she reaches port.

It is therefore ordered and adjudged:

1. That the exceptions to the findings of fact by the commissioner be, and the same are, overruled, and such findings of fact affirmed.

2. That the exceptions to the conclusions of law by the commissioner, except as hereinbefore noted, be, and the same are, overruled, and such conclusions affirmed.

3. That the bottomry bond filed by the American National Bank of Philadelphia is allowed as a bottomry bond to be paid out of the surplus of the proceeds of sale after the award for salvage services and cost.

4. That an allowance of $200 be paid to E. S. Martin, Esq., commissioner herein, for services, and the bill of Miss Estelle Schrier, stenographer, for taking and transcribing the testimony before the said commissioner, both of said claims be paid as cost out of the proceeds of sale now in the registry of this court.