RHEDEREI ACTIEN GESELLSCHAFT OCEANA v. CLUTHA SHIPPING CO., Limited.

(District Court, D. Maryland. July 2, 1915.)

1. ADMIRALTY ⬦35—ABATEMENT OR SUSPENSION OF SUIT—PENDENCY OF GARNISHMENT PROCEEDINGS.

A defendant is entitled to bring to the attention of the court the fact that the debt sued for has, prior to the institution of the suit, been garnished in another court, and that the garnishment proceedings are still pending; and while the effect of such fact is not settled by uniform decision, the better practice in admiralty is to suspend the suit until the garnishment proceeding is terminated.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 322–326; Dec. Dig. ⬦35.]

2. ADMIRALTY ⬦13—JURISDICTION—MARITIME CONTRACTS.

Libelant, having a contract with a shipper to furnish vessels for three years to carry cargoes of chrome ore from Scotland to Atlantic ports in

---

the United States at a stipulated rate of freight per ton, procured a charter of respondent's vessel to the shipper to carry one of such cargoes, on an agreement by respondent to pay libelant a stated sum per ton from the freight money when received. *Held*, that the latter contract which was in effect one for payment of a commission for obtaining a charter, was not maritime, and that a suit thereon was not within the admiralty jurisdiction.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 164–176; Dec. Dig. ☞13.]

In Admiralty. Suit by the Rhederei Actien Gesellschaft Oceana against the Clutha Shipping Company, Limited. Dismissed for want of jurisdiction.

Burlingham, Montgomery & Beecher, of New York City, and Arthur D. Foster, of Baltimore, Md., for libelant.

Convers & Kirlin, of New York City, and Ritchie, Janney, Griswold & Hamilton, of Baltimore, Md., for respondent.

ROSE, District Judge. The libelant is a German corporation; the respondent, a British. Another British corporation, the Chrome Company, Limited, comes into the story. For brevity, these three will be called, respectively, the German Company, the shipowner, and the Chrome Company.

About August 1, 1913, the German and the Chrome Companies entered into a contract by which the former undertook to supply the latter with steamers for the transportation during the calendar years 1914, 1915, and 1916 of a large quantity of chrome ore from New Caledonia to various ports on the Atlantic coast of the United States. For the ore carried during 1914 the Chrome Company was to pay freight at the rate of 35 shillings a ton. The steamer John Hardie belonged to the shipowner. In early May, 1914, it was seeking a charter. The German Company obtained one for it by tendering it to the Chrome Company under the ore contract. By the terms of this charter, which was dated May 4, 1914, the Chrome Company was to pay the shipowner freight at the rate of 35 shillings a ton. By a letter of the same date the shipowner promised to pay in Glasgow to the German Company 8 shillings 6 pence a ton so soon as it received the agreed freight of 35 shillings a ton from the Chrome Company. In December, 1914, the John Hardie delivered 6,050 tons of the ore in Baltimore. On the 21st of that month the German Company filed this libel in personam against the shipowner. It seeks thereby to recover the equivalent in American currency of 6,050 times 8 shillings and 6 pence, or $12,573.42. There was a clause of foreign attachment under which the John Hardie was seized. It has been released on stipulation.

The shipowner in its answer sets up eight defenses. Upon analysis, they resolve themselves into five. They are: Want of consideration for the promise sued on; the insolvency of the libelant, and a resulting incapacity to sue in its own name; the garnishment in Scotland in the hands of the shipowner prior to the filing of the libel of all the assets of the German Company, including the claim sued on;

that the war has made it illegal for the shipowner to pay the libelant anything; and that an American court of admiralty should decline jurisdiction of such a controversy.

The German Company has excepted to the sufficiency of each of these defenses. The procuring of the charter was ample consideration for the promise of the shipowner. Whether the German Company can maintain this proceeding in its own name without joining others can be better told after it has answered the interrogatories of the shipowner as to the history and consequence of the insolvency proceedings. If the case is to go on farther, these interrogatories should be answered, and the exceptions to them interposed by the German Company should in that event be overruled.

[1] A defendant is entitled to bring to the attention of the court the fact that the debt sued for has prior to the institution of the suit been garnished by another court, and that such garnishment proceedings are still pending. Chicago, Rock Island & Pacific Ry. Co. v. Sturm, 174 U. S. 713, 19 Sup. Ct. 797, 43 L. Ed. 1144. The authorities differ as to whether the effect of such a defense is to abate the action, or merely to suspend it until the termination of the garnishment proceedings enables the second court to know what justice requires. Wallace v. McConnell, 13 Pet. 150, 10 L. Ed. 95; Lynch v. Hartford Fire Ins. Co. (C. C.) 17 Fed. 627; Rood on Garnishment, §§ 199, 200. In a court of admiralty, untrammeled by rigid rules of pleadings, the latter would appear to be the more equitable course.

Three of the defenses set up in the answer are based upon the war. Of one of them little need be said. The contention that the clause of the charter party to the effect that the restraint of princes will excuse nonperformance is a part of the contract sued on, and releases the shipowner from any obligation to pay, is untenable. Had such restraint, or any other cause not the fault of the shipowner, prevented the payment of freight by the Chrome Company, the German Company would, of course, have had no claim. In fact, however, the 35 shillings a ton called for by the charter has been paid.

The other two cannot be so easily disposed of. One of them says that all payments by the shipowner to the German Company have been forbidden by a British statute and by various orders in council; the other, that they are prohibited by the common law. Legislative enactments and executive orders, so far as concerns the matter now in hand, are merely declaratory of the common law, and no further reference to them will be made. The war has not avoided the contract sued on. It is true that, when war breaks out, all contracts calling for commercial or financial intercourse between persons residing in mutually hostile countries, and the performance of which cannot be fairly postponed until the return of peace, are abrogated. Griswold v. Waddington, 16 Johns. (N. Y.) 438; Janson v. Driefontein Consolidated Mines, Ltd., Law Reports, Appeal Cases 1902, p. 499.

The agreement in question is very simple. The German Company obtained a charter for the shipowner. The latter agrees to pay the former a part of the freight money when received. The German Company had before the war done all that it had promised to do. All that the shipowner had still to do was to pay the 8 shillings 6 pence so soon

as it received its chartered freight. The fact that on August 4th the shipowner had not completed the carriage of, the ore is without significance. Had the shipowner been the subject of one of the warring powers and the Chrome Company of one of its antagonists, the war would have abrogated the charter. Both companies were in fact British, and the charter and its obligation were unaffected by the war. When what those companies had to do was done, the German Company was entitled, or, but for the outbreak of hostilities, would have been entitled, to receive twelve thousand and odd dollars. So far as concerns the issues raised by the outbreak of the war, it was in no different position from what it would have been, had the shipowner in payment for the charter party given it a promissory note payable on December 23d. The law is well settled that such a debt is not discharged by the war. Janson v. Driefontein Consolidated Mines, Ltd., supra.

In proceedings of an equitable nature the courts will try to insure that when peace is restored due payment shall be made. Ex parte Boussmaker, 13 Vesey, 71. Nevertheless, the alien enemy cannot compel payment during hostilities, nor can the debtor lawfully pay him. This has long been the recognized law of Germany, of England, and of the United States—the countries of the residences of the parties and the country in whose courts the instant suit is pending. Paragraph "h" of article 23 of The Hague Convention on the Customs of War on Land has not changed the law in this respect. Porter v. Freundenberg, 31 Times Law Rep. 162.

So much is not disputed. But the German Company says for all that it is entitled to recover because in its view such suspension is nothing but a war measure by which one belligerent seeks to deprive the other of a part of its resources. In proof that the rule of law has no other important end, it points to the fact that, while an alien enemy cannot sue, he can be sued whenever the courts of his adversary can get jurisdiction over him or his property. Dorsey v. Kyle, 30 Md. 512, 96 Am. Dec. 617; Robinson v. Continental Ins. Co. of Mannheim, 31 Times Law Reports, 20.

The shipowner replies that, while taking from an enemy the use of his property is one of the objects of the general rule, it is not the only or even the chief. A citizen voluntarily remaining in war time in an enemy's country is in these respects under the same disabilities as an alien. Dicey on Parties to Action, 3. Contracts made even during the continuance of hostilities between him and a citizen of the country in which he is residing are not necessarily illegal. Kershaw v. Kelsey, 100 Mass. 561, 97 Am. Dec. 124, 1 Am. Rep. 142.

The fundamental purpose of the rule, the shipowner contends, is to prevent persons having in war time any unauthorized intercourse across the line. Such intercourse, the Supreme Court has said, may afford facilities for conveying intelligence and even for traitorous correspondence. Matthews v. McStea, 91 U. S. 7, 23 L. Ed. 188. Chancellor Kent is even more emphatic in declaring that commercial correspondence, intercourse, and dealing between subjects and residents of the belligerent countries would counteract the operations of law

and throw obstacles in the way of the public efforts and lead to disorder, imbecility and treason. 1 Kent's Comm. 66.

In short, the German Company says that even in war times good faith and fair dealing require that debts shall be paid. The refusal to permit an enemy to collect from a citizen is a war measure which a neutral court will not enforce. The shipowner replies, not so. Such interdiction is a natural result of war, and not an intentional aggravation of its baneful consequences. If two countries are to fight at all, private and unauthorized intercourse, dealings, or payments across the line will injuriously affect both public and private morality. Judge Veeder in a careful recent opinion has held that the shipowner's contention is the stronger. Watts, Watts & Co., Ltd., v. Unione Austriaca di Navigazione (D. C.) 224 Fed. 188.

In the case at bar the contract is in every sense British. The German Company did all it was to do in Glasgow. It was there that the shipowner was to do its part; that is, to pay the 8 shillings 6 pence a ton. The incidents of demand and payment are to be regulated and determined by the law of the place of performance. Roquette v. Overman, L. R. 10 Q. B. 525. Had not war broken out, the German Company, in order to maintain its suit here, would have had to allege a demand in Glasgow, or else to set forth facts which would show that such demand would have been useless. It says that the existence of the war, of which the court will take judicial notice, exempts it from the necessity of demanding payment in Glasgow, and requires this court to compel such payment here. This contention is made in spite of the fact that the contract, having been made in Glasgow and to be there performed, necessarily assumed that the existing Scottish law, so far as pertinent, was made a part of its terms. Furtado v. Rodgers, 3 Bosanquet & Puller, 191. By that law during war payment could not have been lawfully made to the German Company.

Apparently the shipowner has rather the better of the argument. Interesting and important as is the issue thus raised, it is unnecessary in this case to pass definitely upon it. This suit is between foreigners. It is over a contract made and on both sides to be wholly performed in Scotland. The only connection it has with this country is that the time of payment was fixed by an event which took place here. There are many reasons why in war times neutral courts should, so far as their duty permits, decline the task of settling disputes between the subjects of hostile nations. This is especially true when, to determine the controversy, it is necessary either to enforce or to refuse to enforce legal rules which come into operation in case of war only, and to which each of the warring powers habitually makes exceptions when it thinks it for its own interests so to do. If a court of admiralty has ever the right in the exercise of its discretion to decline jurisdiction, it should do so in such a case as this.

[2] But, apart from any such consideration, has this court any jurisdiction over the case here made? Could it hear and determine such a controversy, even if the parties to it were both American citizens, who in time of world-wide peace were suing and being sued on a contract like that here involved, except that it was both made and to be performed in America? What is the contract sued on? It is very

simple.  The German Company gets a charter for the shipowner's vessel at 35 shillings a ton.  The shipowner promises to pay the German Company 8 shillings and 6 pence out of the freight when received.  There is here nothing more nor less than an agreement to pay for getting a charter party.  Such a contract is not maritime.  A suit for the breach of it is not within the jurisdiction of the admiralty. Brown v. West Hartlepool Steam Nav. Co., 112 Fed. 1018, 50 C. C. A. 664; Taylor v. Weir (D. C.) 110 Fed. 1005; The Harvey and Henry, 86 Fed. 656, 30 C. C. A. 330; Doolittle v. Knobeloch (D. C.) 39 Fed. 40; The Thames (D. C.) 10 Fed. 848; The Retriever (D. C.) 93 Fed. 480; The Humboldt (D. C.) 86 Fed. 351;  The J. C. Williams (D. C.) 15 Fed. 558; Richard v. Holman (D. C.) 123 Fed. 734; Richard v. Hogarth (D. C.) 94 Fed. 684; The Crystal Stream (D. C.) 25 Fed. 575.

This conclusion has been reached with hesitation and reluctance. None of the distinguished counsel in the case made the point which has been held decisive.  When it was brought to their attention, they agreed there was nothing in it.  They have cited numerous cases which they think show that it should not be sustained.  These decisions have all been considered.  Some of them are to the effect that admiralty has jurisdiction to enforce a contract by which a lien has been given upon freight to secure necessary disbursements for the ship.  Some, notably, The Wyandotte, 145 Fed. 321, 75 C. C. A. 117, decided by the Circuit Court of Appeals for this circuit, say that a bottomry bond may be enforced in toto, although some of the disbursements to secure which it was given were nonmaritime.  Many affirm that admiralty may give redress for the breach of some nonmaritime undertaking, when it is merely incidental to a transaction which was essentially maritime, or may enforce a nonmaritime stipulation of a charter party when it is intimately connected with the essentially·maritime provisions.

In this case there was no attempt to pledge the freight to provide funds for the disbursements of the ship.  The contract sued on was not a term of the charter party.  It may not have been even known to the Chrome Company, which was a party to the charter.  The fact that the commission or compensation of the German Company was not to be paid until the shipowner received from the Chrome Company its agreed freight is nothing more than the understanding, usual in many brokerage contracts, that the commission is not demandable until the seller receives the purchase money.  On the other hand, the shipowner had nothing to do with the original contract between the German Company and the Chrome Company.  To the latter it assumed no obligations, except those set forth in the charter party.  There was no agreement to which all three companies were parties.  There was, first, a contract between the German Company and the Chrome Company; second, one between the shipowner and the Chrome Company; and, third, the one sued on between the German Company and the shipowner.  That one or both of the first two were maritime does not necessarily give that character to the third.

Doubtless there are general expressions in many of the opinions cited by counsel which, literally construed, would justify the contention that a contract for compensation for obtaining a charter party

is maritime and within the jurisdiction of the admiralty. It is a familiar rule, however, that all such language is more or less strictly limited to the facts of the case in which it is sued. In none of these cases was the contract based on a mere agreement, as this is, that if the libelant will get a charter party for a shipowner the latter will pay him part of the freight earned thereunder. The agreement in Graham v. Oregon R. & Nav. Co. (D. C.) 135 Fed. 608, involved much beside. As the authorities heretofore cited show, such contracts, whenever they have come before the courts, have been held to be nonmaritime and outside the jurisdiction of the admiralty.

It follows that the libel must be dismissed for want of jurisdiction.